**Kathy Sue JOHNSON, etc., et al., and Darcel Milton, etc., et al., Plaintiffs-Appellants,**

v.

**BOARD OF EDUCATION OF the CITY OF CHICAGO et al., Defendants-Appellees.**

No. 78–1215.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 30, 1978.

Decided Aug. 13, 1979.

Rehearing and Rehearing En Banc Denied Dec. 6, 1979.

---

Shalom L. Kohn, Chicago, Ill., for plaintiffs-appellants.

Richard E. Girard, Law Dept., Bd. of Ed., Chicago, Ill., for defendants-appellees.

Before CASTLE, Senior Circuit Judge, BAUER and WOOD, Circuit Judges.

BAUER, Circuit Judge.

The principal issue presented by this appeal is whether the Constitution permits local school authorities to impose racial quotas on enrollments in connection with a desegregation plan voluntarily enacted to prevent *de facto* segregation in the public schools. Plaintiffs-appellants appeal from the order of the district court upholding the challenged desegregation plan as constitutional and enjoining the defendants-appellees to maintain and to continue the plan, as modified to provide for the voluntary busing of students excluded from admission to their neighborhood high schools to alternative integrated high schools. Appellants further appeal from the order of the district court denying their petition for attorneys fees. We affirm the judgments appealed from for the reasons set forth below.

I

These consolidated civil rights actions for declaratory judgment and injunctive relief were filed on March 15, 1976, challenging as unconstitutional a desegregation plan adopted voluntarily by the Board of Education of the City of Chicago in an effort to arrest the trend toward segregated enrollments at two Chicago public secondary schools. The challenged desegregation plan, commonly referred to as the "Student Racial Stabilization Quota Plan" ("Plan"), established a ceiling on enrollments and im-

posed racial quotas with respect to admissions at Morgan Park and Gage Park High Schools. Plaintiffs-appellants in *Johnson v. Board of Education* are black children and their parents residing in the Morgan Park High School attendance area.[1] Plaintiffs-appellants in *Milton v. Board of Education* are black children and their parents residing in the Gage Park High School attendance area. Plaintiffs' complaints alleged that the Plans, as instituted at Morgan Park and Gage Park High Schools, deprived them of their rights under the Constitution and under Title 42 U.S.C. §§ 1981 and 1983, and under Title 20 U.S.C. § 1703(c) because the Plans restricted the admission of minority students to these high schools solely on the basis of race.

Defendants-appellees named in these actions are the Board of Education of the City of Chicago, the individual members of the Board of Education, and Dr. Joseph P. Hannon, General Superintendent of Schools. Defendants filed answers to the complaints, denying the Plans were unconstitutional and denying plaintiffs were deprived of any rights under federal law. Defendants further alleged that plaintiffs had no constitutional right to attend Morgan Park or Gage Park High School since the Board of Education, vested by state statute with the supervision and management of the public school system of the City of Chicago, is empowered to divide the city into attendance areas and to apportion the pupils to the several schools, taking into consideration the prevention of racial segregation in the public schools. In the performance of these statutory duties, the Board contended the Plans were necessary to alleviate overcrowding and to promote integration at Morgan Park and Gage Park High Schools, both of which had experienced an accelerated change in the size and racial composition of their enrollments as a result of a concomitant demographic change in the residential neighborhoods encompassing the attendance areas of these schools.

On April 29, 1976, three days after the filing of defendants' answer, plaintiffs in *Johnson* presented a motion for a temporary restraining order seeking to enjoin the implementation of the Plan at Morgan Park High School, which was scheduled to begin the next day with a lottery drawing to select the incoming freshman class for the fall of 1976. The district court denied the motion. On August 17, 1976, after extensive discovery by means of interrogatories and document production, plaintiffs filed a motion for a preliminary injunction or in the alternative for summary judgment. On September 27, 1976, the district court denied the alternative motion for summary judgment, but deferred ruling on plaintiffs' motion for preliminary injunction, stating its preference for a modification of the Plans to include a voluntary busing program for students excluded from these two schools to attend alternative integrated high schools.

At the conclusion of discovery, entry of a final pretrial order, stipulation of additional facts and admission of exhibits into evidence, and after both parties agreed to withdraw objections, the parties rested on June 27, 1977. At that time, counsel for the Board advised the court of a pending modification of the Plans to be acted upon at the next Board meeting. The district court then stated it was prepared to find the Plans as originally adopted to be unconstitutional, but would reserve final ruling pending any modification the Board might wish to present.

On July 13, 1977, the Board adopted a modification of the Plans, which provided bus transportation to white or integrated schools from a convenient point near the residences of all students in the Gage Park and Morgan Park attendance areas who were not selected for admission to these two schools under the Plans. By an order

1. The term "attendance area", as used herein, refers to the geographic zone or sub-district of the Chicago public school district established by the Board of Education for Gage Park and Morgan Park High Schools. All elementary students residing within the Gage Park sub-district are eligible to attend Gage Park High School. Similarly, all elementary students residing in the Morgan Park sub-district are eligible to attend Morgan Park High School.

of the district court entered August 12, 1977, the Board was directed to implement procedures for publicity and student counseling with respect to the Plans, as modified, and further, to provide that designated spaces at the alternative schools which were not filled by students excluded from one school (e. g., Gage Park) would be made available to students excluded from the other school (e. g., Morgan Park).

On December 30, 1977, the district court entered its findings of fact and conclusions of law, and granted judgment in favor of the defendants. The court held that the Plans, as modified to include bus transportation to primarily white or integrated schools for those students not admitted to Gage Park or Morgan Park High Schools, restored to plaintiffs their constitutional rights in that plaintiffs had a meaningful opportunity to attend a Chicago public high school in an integrated setting. The court further ordered that defendants be enjoined to continue the Plans, as modified. On January 23, 1978, the district court granted plaintiffs' petition for costs, but denied their request for attorneys fees.

Plaintiffs subsequently appealed from these adverse judgments to this Court. First, appellants contend the Plans, as modified, violate their rights secured by the equal protection clause of the Fourteenth Amendment. Second, appellants contend that the district erred in denying their request for attorneys fees.

II

Before addressing the merits of the appellants' contentions, however, it is necessary to explicate in appropriate detail the development and implementation of the challenged desegregation plan, as supported by the record before this Court.

*Gage Park and Morgan Park High Schools Prior to the Adoption of the Plans*

Gage Park High School, 5630 South Rockwell Avenue (2600 West), Chicago, and Morgan Park High School, 1744 West Pryor Avenue (11200 South), are public high schools owned and operated by the Board of Education of the City of Chicago. But for the Board's Plans, freezing enrollment and establishing racial quotas with respect to admissions at these two high schools, all eighth grade students residing in the Gage Park or Morgan Park attendance areas would have been offered the opportunity to attend Gage Park or Morgan Park High School. In 1975, Gage Park High School was approximately 41% white and 59% nonwhite, while Morgan Park was 37% white and 63% nonwhite. The comparable figures for 1976 are 42% white and 58% nonwhite for Gage Park, and 38% white and 62% nonwhite for Morgan Park. As the district court found, students enrolled at Gage Park and Morgan Park are thus attending school in an integrated setting.

The district court also found that the residential neighborhoods encompassing attendance areas for these two schools were in part undergoing an accelerated racial change from white to black in the period immediately preceding the implementation of the Plans, which began in September 1975 at Gage Park High School and in September 1976 at Morgan Park High School. Both schools were also operating in excess of their permanent facility capacities because of increasing enrollments.

During the period from 1972 to 1974, black enrollment at Gage Park had increased from 1,056 to 1,361. The racial composition of all students attending public and nonpublic elementary schools in the Gage Park attendance area in 1975 was 5,235 black, 8,617 white, 1,174 Hispanic and 110 "other". As of January 30, 1976, enrollment at Gage Park High School was 2,441 and the school was operating at 106% of capacity.

During the period from 1972 to 1975, black student enrollment at Morgan Park had increased from 52.3% to 62.3% and white student enrollment had declined from 45.7% to 36.9%. In this same period, total enrollment increased from 3,092 to 3,423. The racial composition of all students attending public and nonpublic elementary schools and residing in the Morgan Park attendance area in 1976 was 6,842 black,

7,312 white, and 144 "other". As of January 30, 1976, enrollment at Morgan Park High School was 3,323 and the school was operating at 128.6% of capacity of permanent facilities.

Statistics presented by the Board of Education indicated that in rapidly changing neighborhoods where no action had been undertaken by the Board segregated schools had resulted. For example, during the period from 1970–1975, white enrollment at the following Chicago public high schools declined dramatically: Fenger High School, 46.6% to 1.0%; Orr High School, 30.6% to 5.0%; Bowen High School, 36.2% to 6.6%. The Board therefore regarded the Student Racial Stabilization Plans as necessary to prevent the incidences of racial isolation which had occurred at schools situated in neighborhoods experiencing a rapid change in racial composition.

The Board's stated purpose for the adoption of the racial quotas was to prevent overcrowding and to prevent Gage Park and Morgan Park High Schools from becoming racially segregated. Consequently, the quota for the admission of black students at each school was necessarily set at a lower level than that at which black students would have applied and have been admitted but for the quota.

*The Gage Park Plan*

On May 14, 1975, the Board of Education of the City of Chicago adopted a Student Racial Stabilization Quota Plan establishing a ceiling on enrollment and a racial quota with respect to admission at Gage Park High School. Under this Plan, enrollment, which had reached 2,441 and was projected at 3,100 for September 1975, would be held to a maximum of 2,800 students with a racial composition of 48% black, 42% white, 8% Hispanic and 2% principal's option. The selection of incoming freshmen would be determined by lottery.

The first lottery, in preparation for the September 1975 academic year at Gage Park High School, was held on June 2, 1975. Under the Plan, separate lottery lists were prepared for white, black and Hispanic students and students were selected for admis-sion in the order their names appeared on the list until the quota for their race had been filled. Thus, the group of students accepted into Gage Park for the September 1975 school year included all those names down to a red line on the lottery list for each race. The red line appeared immediately below the last name on the lottery list for white students—No. 289. By contrast, the red line appeared below name 200 on the black list, which had a total of 498 names, indicating the exclusion as of that date of 298 applicants.

Students initially denied admission were offered the opportunity to attend Gage Park High School in the event another student of the same race, previously admitted to the school, elected not to attend. Moreover, since the racial percentages were to be applicable to the school as a whole rather than to the incoming class, additional black students were to be admitted to the extent that additional white students elected to attend Gage Park so that the prescribed racial balance was maintained. Thus, within two weeks after the lottery drawing an additional 60 black elementary students who had been placed on a "waiting list" were given the option to enroll in Gage Park High School. By October 1, 1975, all of the originally excluded 498 black students had been offered the option of enrolling in Gage Park. An additional 212 black students who applied for admission after the June 2, 1975 lottery were not offered the option of enrolling into Gage Park High School. Each of the 136 additional white students applying for admission after June 2, 1975 lottery were offered the opportunity to enroll at Gage Park High School.

The Gage Park Plan was also applied to the freshman class entering in September 1976, with the applicable lottery drawing held on January 19, 1976. The entering class in 1976, as determined by the drawing, was 44% white (229/519), 43% black (224/519) and 12% Hispanic (61/519). A student racial/ethnic survey dated October 29, 1976, and conducted by the Board of Education, showed that the entering freshman class of September 1976 at Gage Park

was in fact 42.6% white (228/535), 45.4% black (243/535), and 11.4% Hispanic (61/535).[2]

With respect to the January 1976 drawing for the school year commencing in September 1976, a red line appeared immediately below the last name on the list for white students, No. 309. By contrast, the red line appeared below name No. 300 on the black list, which contained a total of 626 names, indicating the exclusion at the time of the drawing of 326 black applicants. Thus, all 309 white students included in the January lottery and all 181 white students applying thereafter were offered the opportunity to enroll in Gage Park for September 1976. Of the 626 black students included in the lottery and the 210 additional students applying thereafter, 300 black students were permitted to enroll and 243 actually attended Gage Park High School. At least 411 black students were excluded from Gage Park High School as of October 12, 1976 as a result of the racial quota.

On January 21, 1977, a lottery drawing was held for the September 1977 freshman class at Gage Park High School. Of the 754 black children in the lottery drawing, 425 were accepted as enrollees and 329 were denied admission. Of the 85 Hispanic students, 35 were accepted and 50 were denied admission. Not one of the 364 white students who applied was denied admission to Gage Park High School.

*The Morgan Park Plan*

On March 10, 1976, the Board of Education adopted a Student Racial Stabilization Quota Plan which established a ceiling on enrollment and imposed a racial quota with respect to admission at Morgan Park High School. Overcrowding at Morgan Park, which was operating at 128.6% of its permanent facilities capacity, was to be reduced by limiting the enrollment of incoming 9th graders to 700 students divided approximately 50% white and 50% black. Unlike Gage Park, there is no significant number of Hispanic students attending Morgan Park High School. The Morgan Park Plan differed in two other respects from that implemented at Gage Park. First, the racial quotas were applied to each entering class, rather than to the school as a whole. Second, the Morgan Park Plan provided for the admission of a maximum of 350 black students, even if less than 350 white students applied. By contrast, the Gage Park Plan admitted black students to the extent that sufficient numbers of white students were in attendance so that the requisite 48% to 42% black-to-white student ratio was maintained.

The lottery to determine the September 1976 admissions to Morgan Park High School was held on April 30, 1976. As of May 10, 1976, ten days after the drawing, all 484 white students in the lottery were offered the option to enroll in Morgan Park. An additional white student, who apparently was never assigned a lottery number, was notified of her admission on May 11, 1976. Subsequently, 33 white students applying as transfer students were also admitted. Of the 480 black students seeking admission, 350 were offered the option to enroll in Morgan Park, indicating that 131 black students were denied admission as of that date. On or after September 27, 1976, 33 of the black students placed on the "waiting list" were offered the opportunity to enroll at Morgan Park. A number of such students, who were attending other schools at that time, declined to transfer to Morgan Park. Thus, as of October 29, 1976, 538 black and 490 nonblack students were eligible to apply for admission to the 1976 freshman class. No white student was denied admission to Morgan Park, but 126 black students were denied admission, which number included 15 transfer students. The number of students actually admitted to Morgan Park High School as freshman in September 1976 was 350 black and 272 nonblack.

On February 3, 1977, the applicable lottery drawing was held for the September

---

2. In 1975 and 1976, all of the freshmen attended the Gage Park High School "branch", which is on the same campus as the high school, is part of the permanent facility, and is utilized by freshmen only.

1977 freshman class at Morgan Park High School. The eligible students included 610 whites and 612 blacks. In April 1977, each white student who wished to attend Morgan Park High School was notified of his or her admission; the total admitted was 317. At the same time, 350 black students were notified of their admission, and 157 black children who wished to attend the school were excluded.

*Results of the Original Plans*

At the time the Student Racial Stabilization Quota Plans were adopted there were substantially more white students than black students in public and nonpublic elementary schools in the Morgan Park and Gage Park attendance areas. However, it became apparent after the Plans were in operation that the number of white students seeking admission at each high school was less than the quota set for white students and that the number of black and Hispanic students applying exceeded the quotas for those groups. Thus, no white student was ever denied admission as a result of the quotas instituted at Gage Park and Morgan Park High Schools, but hundreds of black and Hispanic students were denied admission to these schools annually from the inception of the Plans.

Under the Plans as originally adopted by the Board, students denied admission to Gage Park and Morgan Park High Schools were permitted to attend any "under-utilized" Chicago public high school through the Board's Permissive Transfer Program.[3] Under this Program, every child attending an over-utilized high school in the City of Chicago (which included Gage Park and Morgan Park High Schools) was given the option of attending an under-utilized school. Thus, prior to and irrespective of the Student Racial Stabilization Quota Plans, Gage Park and Morgan Park High School students could have elected to attend these under-utilized schools.

Until the Board adopted a revised voluntary transfer program, excluded students residing in the Morgan Park and Gage Park attendance areas were required to travel to alternative schools using public transportation. Carfare was provided to students excluded from Gage Park High School commencing in September or October 1976, the second year the Plan was in operation. For students excluded from Morgan Park High School carfare was provided from the inception of the Plan in September 1976.

Of the eighteen general high schools available to those denied admission as a result of the racial quotas, six have significant white enrollments and are located on the north side of the City of Chicago. None of these six predominantly white-attended schools are situated south of 4000 North and three are north of 5800 North in Chicago. By contrast, Gage Park High School is located at 5600 South and Morgan Park is located at 11200 South in Chicago. Thus, the closest of these primarily white alternative schools, Lakeview, is 11.4 miles from Gage Park and 18.15 miles from Morgan Park High School.

Accordingly, under the original Plans, travel to these eighteen schools from Gage Park or Morgan Park High Schools involved (1) taking a bus to the Dan Ryan rapid transit line; (2) transferring from the Dan Ryan to the Howard or Ravenswood rapid transit lines; (3) travel on the Howard or Ravenswood rapid transit lines; and in two instances (4) an additional bus trip to the school.

Of the 416 black students excluded from Gage Park High School as a result of the 1975 lottery, 306 of these students enrolled in 28 other predominantly black high schools, 11 attended 6 other schools with significant white enrollments, and data with respect to the 99 additional black students was unavailable. Of the 539 black students denied admission to Gage Park in the 1976 lottery, 471 students attended 24

3. "Under-utilized" was defined to mean a school with a total student enrollment below the "city-wide per cent of capacity" of 101.3%. In 1975, 22 of 51 general high schools were above the level of 101.3% utilization (excluding so-called "temporary facilities"). In 1976, 29 of 51 high schools were above that level.

alternative high schools with predominantly black enrollments, and 68 students enrolled in 6 alternative high schools with significant white enrollments.

Of the 193 black students excluded from admission to Morgan Park High School in the 1976 lottery, 191 attended alternative schools whose enrollments were over 99% minority, and two students attended one school which had a significant white student enrollment.

*Modification of the Plans*

On July 13, 1977, the Board of Education adopted Board Report No. 77–212–6 (Revised), which modified the Gage Park and Morgan Park Student Racial Stabilization Quota Plans by providing excluded minority students the option of attending certain North side predominantly white or integrated schools by means of bus transportation provided by the Board of Education. Under the terms of the modification enacted by the Board, ten alternative white or integrated schools were made available to excluded Gage Park and Morgan Park black children, with up to 1,262 spaces designated for Gage Park transfer students and up to 390 spaces designated for Morgan Park transfer students to these schools. In addition, the modification included a publicity program concerning the Plans and a counseling service for students who participated in the Plans. These modifications were implemented immediately by the Board in order to be incorporated into the operation of the Plans for the school term beginning in September 1977.

*Results of the Modified Plans*

As of October 12, 1977, 102 of the 1,632 students excluded as a result of the Gage Park and Morgan Park Plans had availed themselves of the opportunity to attend one of these ten alternative high schools, utilizing 7 buses at a cost of $1,014 per day. As of October 1978, the Board reported that 359 excluded students were participating in the Plan for the 1978 school year, and attending nine of the alternative schools offered under the modified Plan.

The district court found that the Plans were attempts on the part of the Board to relieve overcrowding and to promote integration at schools situated in rapidly changing neighborhoods, and that experience had shown that the Board achieved both objectives at each high school. Thus, as a result of the modified Plans, the racial balance at Gage Park High School is 45.4% black, 41.9% white, and 12.7% "other", and the racial balance at Morgan Park is 59% black and 41% white. The enrollment at Gage Park has been reduced to 2,102 students and the school is operating at 91.3% of capacity. The Morgan Park enrollment has been reduced to 2,613 students and the school is operating at 101.2% of capacity.

### III

Appellants' principal contention on appeal is that the Student Racial Stabilization Quota Plans instituted by the Board of Education at Gage Park and Morgan Park High Schools are statutorily and constitutionally infirm. We are not persuaded by the arguments advanced in support of these contentions, and accordingly conclude that the Plans, as modified, are statutorily and constitutionally permissible.

### A

We begin by addressing the appellants' argument that the Illinois School Code explicitly proscribes the racial quotas challenged in this litigation.[4] It is true, as

---

4. The Illinois statute governing the powers of the Board of Education of the City of Chicago provides, in pertinent part, as follows:

"The board shall exercise general supervision and management of the public education and the public school system of the city, and shall have power:

\* \* \* \* \* \*

"7. To divide the city into sub-districts and apportion the pupils to the several schools, but no pupil shall be excluded from or segregated in any such school on account of his color, race, sex, or nationality. The board shall, as soon as practicable, and from time to time thereafter, change or revise existing sub-districts or create new sub-districts in a manner which will take into consideration the prevention of segregation and the elimination of separation of children in public schools because of color, race, sex or nationality. . . ."
Ill.Rev.Stat.1975, ch. 122, § 34–18, para. 7.

**514**

the appellants argue, that the statute appears on its face to prohibit the Board from considering race as a basis for excluding a student from admission to a public school situated within a particular attendance area. However, it is also true that the statute empowers the Board to consider race as a basis for revising the geographic boundaries of a particular attendance area where necessary to prevent racially segregated enrollments. Indeed, we think a fair reading of the statute discloses that the central purpose of this provision was to invest the Board with sufficient discretionary authority to achieve "the prevention of segregation and the elimination of separation of children in public schools because of color, race, sex or nationality." Viewing the statute in light of this purpose, we perceive no rational basis for a statutory construction which permits the Board to prevent segregation through a racially-based redistricting plan but prohibits the Board from achieving the same end through a racially-based intradistrict transfer plan. We therefore decline to ascribe to the statute a prohibition inconsistent with its underlying purpose, and accordingly hold that the statute does not foreclose the Board from restricting the racial composition of the enrollment at a school within a particular attendance area where, as here, such a remedial measure achieves the prevention of *de facto* segregation in the public schools. *See North Carolina State Board of Education v. Swann*, 402 U.S. 43, 45–46, 91 S.Ct. 1284, 28 L.Ed.2d 586 (1971).

Nor are we persuaded that the Board of Education exceeded its statutory authority in establishing racial quotas with respect to admissions at Gage Park and Morgan Park High Schools. In reviewing various integration solutions promulgated by local school boards, the Supreme Court has consistently recognized that local autonomy of school districts is a vital national tradition. *Milliken v. Bradley*, 418 U.S. 717, 741–742, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974); *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 49, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973); *Wright v. Council of*

*City of Emporia*, 407 U.S. 451, 469, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972).

Moreover, it is well-settled in both federal and state law that local school boards may voluntarily adopt plans including busing to promote integration. As the Supreme Court declared in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971):

> School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within the broad discretionary powers of school authorities . . . . ."

402 U.S. at 16, 91 S.Ct. at 1276. The Illinois Supreme Court has also recognized the authority of local school boards to undertake voluntary programs designed to remedy *de facto* segregation, as stated in *Tometz v. Board of Education, Waukegan City School District No. 61*, 39 Ill.2d 593, 237 N.E.2d 498 (1968):

> "State laws or administrative policies, directed toward the reduction and eventual elimination of *de facto* segregation of children in the schools and racial imbalance, have been approved by every high State court which has considered the issue. . . . Similarly, the Federal courts which have considered the issue . . . have recognized that *voluntary* programs of local school authorities designed to alleviate *de facto* segregation and racial imbalance in the schools are not constitutionally forbidden. . . . ."

39 Ill.2d at 597, 237 N.E.2d at 501 (citations omitted) (emphasis added).

In the case at bar, the Chicago Board of Education voluntarily adopted a desegregation plan designed to prevent *de facto* racial segregation at two public high

schools. The record is uncontroverted that prior to the implementation of the Plans, the attendance areas for Gage Park and Morgan Park High Schools were rapidly changing in residential occupancy from white to black and the trend in enrollments was toward segregated student bodies. The district court found, based on a voluminous record, that the Plans successfully arrested this trend and concluded that, as a result of the Board's modification of the Plans, all high school students living in those attendance areas were provided with a meaningful and viable opportunity to attend an integrated high school.

Accordingly, in view of the broad statutory powers vested in the Board to formulate and to implement educational policy, including the establishment of programs designed to preserve integration in the public schools, we regard the Board's efforts to prevent *de facto* segregation as a legitimate exercise of its discretionary authority consistent with its legislative mandate and established principles of local school autonomy.

### B

Of course, no state law may operate in contravention of the Constitution. School board policies and the present laws with respect to local autonomy are not sacrosanct, and if they conflict with the Fourteenth Amendment federal courts are charged with an affirmative duty to prescribe appropriate remedies. *Milliken v. Bradley*, 418 U.S. 717, 744, 94 S.Ct. 3112 (1973). The principal task before this Court, therefore, is to determine whether the imposition of a racial quota against the admission of minority students to particular

schools, however "benign" in its objectives, violates the equal protection clause of the Fourteenth Amendment.[5]

It is well-settled that state actions which restrict fundamental rights or which distinguish between individuals solely on the basis of race are regarded as inherently suspect and subject to strict judicial scrutiny. *Korematsu v. United States*, 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944); *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 16–17, 93 S.Ct. 1278 (1973). The state action challenged here, however, does not involve a fundamental right. Federal and state courts have uniformly rejected the contention of a constitutional right to attend a particular school. *See, e. g., McDaniel v. Barresi*, 402 U.S. 39, 91 S.Ct. 1287, 28 L.Ed.2d 582 (1971); *Norwalk C. O. R. E. v. Norwalk Board of Education*, 423 F.2d 121 (2d Cir. 1970); *Allen v. Asheville City Board of Education*, 434 F.2d 902, 905 (4th Cir. 1970); *Moss v. Stamford Board of Education*, 356 F.Supp. 675 (D.C. Conn.1973); *People ex rel. Altman v. Board of Education of the City of Chicago*, 90 Ill.App.2d 21, 30, 234 N.E.2d 362, 366 (1967); *Citizens Against Busing v. Palmason*, 80 Wash.2d 445, 495 P.2d 657 (1972).

But there is no question that the challenged desegregation plan rests solely upon distinctions according to race. Therefore, if the Plans are to be upheld, they must be shown to be necessary to the accomplishment of some permissible state objective, independent of the racial discrimination which it was the object of the Fourteenth Amendment to eliminate, *Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967), and even then, only if

---

**5.** The threshold question raised by the parties is the proper standard of judicial review. Appellants contend the racial quotas are explicit classifications based solely upon race. As such, appellants argue the Plans merit strict judicial scrutiny and accordingly cannot be justified in the absence of a compelling state interest. Appellees contend the appropriate standard of review is whether the assertedly benign discrimination attendant with the racial quotas bears a rational relationship to the legitimate governmental purpose of preventing *de facto* segregation in the public schools. We reject

appellees' contention, as well as their further argument that, by characterizing the Plans as *voluntary* affirmative action, the applicable standard of review is less exacting than strict scrutiny. We regard any state action involving racial discrimination, however "benign", as requiring analysis under the strict scrutiny-compelling state interest standard. *See, e. g., University of California Regents v. Bakke*, 438 U.S. 265, 291, 98 S.Ct. 2733, 57 L.Ed.2d 750 (Opinion of Powell, J.), 357 (Opinion of Brennan, White, Marshall, Blackmun, JJ.) (1978).

no less restrictive alternative is available. *See, e. g., San Antonio Independent School District v. Rodriguez, supra; Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972).

■ Guided by these principles, we proceed to an examination of the merits of the arguments advanced by the appellants in support of their contention that the Plans are violative of the Fourteenth Amendment. First, appellants contend the Board failed to establish the requisite compelling state interest to justify the imposition of racial quotas in connection with the Plans. The record in these cases plainly refutes this contention. The Board's articulated purpose for the adoption of the Plans was the alleviation of overcrowding and the prevention of *de facto* segregation at Gage Park and Morgan Park High Schools. We find the state interest in promoting integration in these two high schools and communities, while at the same time affording all students residing in these attendance areas a viable opportunity to attend high school in an integrated setting, to be compelling.

■ Second, appellants argue that the Board failed to show that the racial quotas were necessary to achieve the state interest in preventing the racial segregation of Gage Park or Morgan Park High Schools. This assertion is similarly unsupported by the record. It had been the Board's experience that, where no stabilization quota plans were instituted, schools situated in rapidly changing residential neighborhoods had become racially segregated. For example, at Fenger High School, which adjoins the Morgan Park attendance area on the east, white enrollment declined from 46% to 1% during the period 1970–1975. The Gage Park and Morgan Park attendance areas had been undergoing an accelerated change in residential occupancy from white to black and, while these high schools were still integrated at the time the Plans were instituted, their enrollments were rapidly becoming predominantly black. Accordingly, the Plans were designed to stabilize the integrated character of Gage Park and Morgan Park High Schools and to prevent their

enrollments from becoming segregated. The district court found the Plans successfully arrested the segregative impact of population change in the attendance areas of these two high schools.

■ Thus, the legitimacy of the racial quotas imposed in connection with this voluntary desegregation plan turns upon a determination of whether the Board may properly consider the unpleasant realities of demographic change and the phenomenon of "white flight" when it seeks to preserve integration in the public schools.

It is clear that the prospect of white flight and consequent resegregation cannot justify failure to comply with a court decree ordering integration. *Monroe v. Board of Commissioners of the City of Jackson,* 391 U.S. 450, 459, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); *United States v. Scotland Neck City Board of Education,* 407 U.S. 484, 490–491, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972). But we regard these cases as inapposite to the factual setting in this case. Both *Monroe* and *Scotland Neck* involved resistance to a judicial order to desegregate, and the circumstances in each case revealed that the motivating concern with respect to white flight was not the preservation of integration, but the interests of white students seeking to accommodate their own prejudice—the disinclination to attend school with black students. In this case, there is no basis in the record to support the contention that the racial quotas imposed were intended to retard integration and to create racial imbalance at these two high schools. On the contrary, it is evident that the Board's voluntary action was motivated by a good faith effort to stabilize the enrollments at Gage Park and Morgan Park High Schools, and to promote integration not only at these two high schools but also at the alternative high schools designated under the Plans.

■ Moreover, where the existence of white flight is not used as a shield to avoid mandatory desegregation or to perpetuate segregation, federal courts have held that ·local school authorities may legitimately

take into account the phenomenon of white flight in formulating voluntary programs designed to achieve integration. *See, e. g., Higgins v. Board of Education of the City of Grand Rapids,* 508 F.2d 779, 794 (6th Cir. 1974); *Parent Association of Andrew Jackson High School v. Ambach,* 598 F.2d 705, 720 (2d Cir. 1979).

Contrary to the appellants' contention, the record in these cases documents the existence of white flight from these two high schools. Although more white students than black students resided in the Morgan Park and Gage Park attendance areas, white enrollments in these schools were declining while black enrollments were increasing. The difference between the numbers of white students eligible to enroll at these high schools and those actually admitted is attributable to the fact that white students were enrolling in parochial schools serving these attendance areas.

The Supreme Court has recognized that "substantial benefits flow to both whites and blacks from interracial association . . .," *Linmark Associates, Inc. v. Willingboro,* 431 U.S. 85, 94–95, 97 S.Ct. 1614, 1619, 52 L.Ed.2d 155 (1977), and those benefits cannot be achieved in the public schools unless a school board may consider steps to resist racial segregation. The record in these cases substantiates the emerging patterns of population change and the concomitant phenomenon of white flight in the Gage Park and Morgan Park communities. This phenomenon cannot be ignored in any meaningful effort to preserve integration at the public high schools serving these communities. The exodus of white children from the public schools would disadvantage the entire community and would imperil the success of this voluntary desegregation plan. In light of these realities, we are persuaded that considerations of race, and in particular, racial quotas, are a necessary means of arresting *de facto* segregation in the public schools. Indeed, in fashioning a school desegregation remedy, race must inevitably be taken into account. In *McDaniel v. Barresi,* 402 U.S. 39, 91 S.Ct. 1287 (1971), involving the busing of black students to other than their neighborhood schools, the Supreme Court declared:

"In this remedial process, steps will almost invariably require that students be assigned 'differently because of their race'. . . . Any other approach would freeze the status quo that is the very target of all desegregation processes."

402 U.S. at 41, 91 S.Ct. at 1289 (citations omitted). Thus, in the limited circumstances of voluntary affirmative action, and in the absence of an invidious or pernicious intent attributable to the Board, we conclude that the Board was entitled to consider the probability of white flight in formulating a remedial plan to prevent *de facto* segregation in the public schools.

We are aware of no persuasive authority to the contrary. Appellants rely on the prior decision of this Court in *Lawlor v. Board of Education of the City of Chicago,* 458 F.2d 660 (7th Cir. 1972), *cert. denied,* 413 U.S. 921, 93 S.Ct. 3045, 37 L.Ed.2d 1043 (1973), as support for their contention that the racial quotas violate the strictures of the Fourteenth Amendment. In *Lawlor,* plaintiffs, who were parents of white students residing in the O'Toole Elementary School attendance area, brought a civil rights action under 42 U.S.C. § 1983 alleging that the administrative practices and policies of the Chicago Board of Education resulted in the denial of due process and equal protection of law by permitting too many black students to attend the O'Toole Elementary School, and that such conduct was causing the departure of white students and would result in the O'Toole attendance area becoming increasingly black. Plaintiffs sought a judicial declaration to that effect, and an injunction which would limit to a range of 10% to 25% the number of black students enrolled in the O'Toole area schools. In affirming the district court's dismissal of the complaint for failure to state a claim, we held that plaintiffs had no constitutional right and the Board had no constitutional duty to establish a particular racial balance.

■ The contention that appellants in the instant case have a constitutional *right* to demand that a school have a particular racial balance was rejected in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 24, 91 S.Ct. 1267 (1971). Moreover, the absence of a constitutional *duty* on the part of the school authorities to establish racially-based enrollments does not preclude the Board from prescribing a racial balance to remedy the segregative impact of demographic change. We therefore find appellants' reliance on *Lawlor* to be misplaced.

Nor do we regard the decision in *University of California Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), rendered subsequent to the district court's decision in this case, as requiring reversal. Clearly, the Plans do not suffer from the constitutional infirmity which Mr. Justice Powell found existing in the total exclusionary admissions program in *Bakke*. Mr. Justice Powell noted that the position of Allan Bakke, who may have been deprived altogether of a medical education, was wholly dissimilar to that of students who are bused from their neighborhood schools to a comparable school for integration purposes. *Bakke, supra* at 300, n.39, 98 S.Ct. 2733. Thus, unlike the admission program in *Bakke*, race is not used under the Board's Plans as the basis for distributing a limited number of spaces among a large number of applicants. Appellants, unlike Allan Bakke, are not excluded from attending school by the racial quotas imposed in this case. Rather, the stabilization quotas established for students living in the Gage Park and Morgan Park attendance area merely involved the reassignment of students, each of whom has been afforded a viable opportunity to attend an integrated high school either at Gage Park or Morgan Park, which have been racially stabilized by the Plans, or at one of the 10 alternative integrated high schools which provide a guarantee of enrollment and bus transportation to facilitate attendance.

■ Accordingly, in view of the findings on the record of the existence of white flight and the compelling state interest in promoting integration, we hold that voluntary state action directed toward the prevention of *de facto* segregation in the public schools is constitutionally permissible where, as here, the racial quotas imposed in connection with the desegregation plan provide all students residing in the attendance areas with a meaningful opportunity to attend an integrated high school.

## C

As an independent basis for finding a violation of the equal protection clause, the appellants contend the Board failed to establish that the objective of preventing *de facto* segregation in the public schools could not be achieved by less discriminatory alternatives. Appellants argue in this connection that the racial quotas operated to devolve upon minority students the entire burden of desegregation, since only minority students were excluded from attending Morgan Park and Gage Park High Schools.

It is true that no white student was ever denied admission to Gage Park or Morgan Park High Schools under the Plans. But it is also true that white students enrolled in these high schools were precluded from transferring to another school until the quota for white students had been exceeded and that when the white enrollment exceeded the established quotas they also would be denied admission. Thus, the implementation of the racial quotas resulted in the exclusion of minority students only because the Plans were designed to address the practical problem of the exodus of white students from Gage Park and Morgan Park, and not because of any inherent inequity in the Plans themselves. Indeed, the racial quotas established for each high school permitted more minority students than white students to enroll, even though the white student population exceeded the nonwhite student population residing in the attendance areas serving these schools. As the district court found, the racial balance at Gage Park is 58.2% nonwhite and 41.9% white, and the racial balance achieved at Morgan Park is 59% nonwhite and 41% white.

The appellants have advanced alternative proposals which they claim would preserve integrated student bodies at Gage Park and Morgan Park High Schools in a less discriminatory fashion. We are not persuaded, however, that these alternatives offer a viable means of preventing *de facto* segregation at these two high schools. Moreover, we regard the mechanics of integration, particularly in the circumstances of voluntary remedial action, where the purpose is obviously to implement the promise of *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and effectively achieves that objective, to be ordinarily a matter within the discretion of local school authorities.

Accordingly, in view of the compelling state interest in preventing *de facto* school segregation, the realities of population change, and the discretion accorded to local school authorities in fashioning desegregation remedies, we perceive no invidious discrimination in the Board's modified stabilization quota plans, which successfully arrested the segregative impact of demographic change and preserved the integrated character of the enrollments at Gage Park and Morgan Park High Schools.

### IV

Appellants also appeal from the judgment entered upon the district court order denying their petition for attorneys fees, contending they were entitled to such fees under the Emergency School Aid Act, 20 U.S.C. §§ 1601 *et seq.*, and under the Civil Rights Attorneys Fees Award Act of 1976, 42 U.S.C. § 1988. We are unpersuaded by the arguments advanced in support of this contention, and therefore conclude that the district court properly denied the requests for attorneys fees.

An award of attorneys fees under the statutes relied upon by the appellants is predicated upon the express condition precedent that the petitioner be a prevailing party and even then, fees may only be awarded upon the exercise of the court's discretion. Title 20 U.S.C. § 1617; Title 42 U.S.C. § 1988. It is patently clear from the record that the appellants were not the prevailing parties in these proceedings. The relief sought by their complaints was the abolition of the Board's Student Racial Stabilization Quota Plans instituted at Gage Park and Morgan Park High Schools. Since the district court upheld the Plans as constitutional, it cannot be said that the appellants prevailed on the merits of their complaints.

Moreover, even assuming *arguendo* that appellants "prevailed" in the sense that these actions resulted in the modification of the Plans to provide bus transportation to alternative schools for students denied admission to Gage Park and Morgan Park High Schools, there is no basis in the record for concluding that the district court abused its discretion in denying appellants' petition for attorneys fees.

For the foregoing reasons, the judgments appealed from are affirmed and the Clerk of this Court is directed to enter judgment accordingly.

AFFIRMED.