Theresa BURNEY, Sileatha Ferguson, Brenda Jackson, Rose Ann Johnson, and Stacey Glover, individually and on behalf of all others similarly situated, and Arlene Goosby, Gia Flannigan, Joann Powell and Leila Smith, Plaintiffs,

v.

HOUSING AUTHORITY OF the COUNTY OF BEAVER, James F. Tress, individually and in his capacity as Executive Director of the Housing Authority of the County of Beaver, John F. Phillips, individually and as Chairman of the Board of Commissioners of the Housing Authority of the County of Beaver, Their Agents, Successors in Office, and Persons acting under their direction, and Homer C. Floyd, Executive Director, Pennsylvania Human Relations Commission, Defendants.

Civ. A. Nos. 78–1137, 79–999.

United States District Court,
W.D. Pennsylvania.

Aug. 20, 1982.

Timothy O'Brien, Neighborhood Legal Services, Pittsburgh, Pa., John W. Dineen, Neighborhood Legal Services, Aliquippa, Pa., for plaintiffs.

Ellen Doyle, Pennsylvania Human Relations Commission, Pittsburgh, Pa., Clarence D. Neish, Aliquippa, Pa., for defendants.

## OPINION

COHILL, District Judge.

Robert Burns' oft-quoted maxim "the best laid schemes o' mice and men gang aft a-gley" perhaps best describes the attempts of the defendants, the Housing Authority of the County of Beaver ("Housing Authority") and the Pennsylvania Human Relations Commission ("Commission") to design a plan to achieve and maintain integration in the Housing Authority's low-income, public housing projects. On October 6, 1978, the plaintiffs herein filed a class action challenging both the plan and the Housing Authority's implementation of that plan. We conducted a six-day non-jury trial and now make the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### Introduction

Two actions, *Theresa Burney v. Housing Authority of the County of Beaver,* Civil Action Number 78–1137, and *Leila Smith v. Housing Authority of the County of Beaver,* Civil Action Number 79–999, were consolidated for trial before this court by the late Judge Daniel Snyder. We have divided this opinion into two parts and will separately address each of these cases. Because the evidence presented at trial and counsels' subsequent arguments focused predominantly on the allegations contained in the *Burney* complaint, it is that case upon which we focus our primary attention and to which we turn first.

### I.

### *Theresa Burney v. Housing Authority of the County of Beaver*

#### A.) The Parties

The named plaintiffs, Theresa Burney, Sileatha Ferguson, Brenda Jackson, Rose Ann Johnson, Stacey Glover, Arlene Goosby, Gia Flannigan, Joann Powell, and Leila Smith are black women, each of whom was an applicant on a waiting list for placement in one of the Housing Authority's projects at the time that this lawsuit was filed. These named plaintiffs represent a class defined as "all minority low income individuals who have applied for public housing with Defendants and all minority low income individuals who will apply for public housing with Defendants."

Defendant, Housing Authority, is a public housing authority of the Commonwealth of Pennsylvania. It was established in 1940 pursuant to the "Housing Authorities Law" of Pennsylvania, 35 Pa.Stat.Ann. §§ 1541–64 (Purdon 1980), and in accordance with the United States Housing Act of 1937, 42 U.S.C. §§ 1437–40 (Supp. II 1978). The Housing Authority is authorized to build, operate and maintain public housing for the purpose of "providing safe and sanitary dwelling accommodations for persons of low income . . . ." 35 Pa.Stat.Ann. § 1542. The Housing Authority currently owns, operates and manages 1,040 low-rent family housing units in sixteen housing projects situated in seven municipalities in Beaver County, Pennsylvania.

Defendant, Commission, is the body charged by the Pennsylvania General Assembly with the responsibility for enforcing the Pennsylvania Human Relations Act, 43 Pa.Stat.Ann. tit. 43, §§ 951–963 (Purdon 1964). That Act prohibits, *inter alia,* racial discrimination or segregation in public housing. On June 3, 1981, we granted the Commission's motion to substitute the name of its Executive Director, Homer C. Floyd, for that of the Commission itself, as a defendant in this case.

Defendant, James F. Tress, at all relevant times, was the Executive Director of the Beaver County Housing Authority, and as such, was empowered by law to administer and manage the Housing Authority's projects.

Defendant, John F. Phillips, at all relevant times, was the Chairman of the Beaver County Housing Authority.

### B.) Background

Before outlining plaintiffs' claims and the many-sided statutory and constitutional arguments of the parties, it is necessary to set forth in some detail the development and implementation of the challenged Consent Order and Decree, as supported by the record before this court.

On August 25, 1971, the Commission filed a formal complaint against the Housing Authority charging that the Housing Authority had violated, and was continuing to violate, section 5(h)(1) of the Pennsylvania Human Relations Act, 43 P.S.A. § 955(h)(1), by maintaining housing projects that were segregated by the race of the tenant. The complaint resulted from a Commission evaluation of Housing Authority statistics, which revealed significant disparities in racial composition among the projects it operates. After determining that there was probable cause to credit the allegations contained in the complaint, Commission staff attempted to resolve the disputed matters by settlement and conciliation, as mandated by section 9 of the Pennsylvania Human Relations Act, 43 P.S.A. § 959. The result of these efforts was the execution of a Consent Order and Decree [hereinafter referred to as the Consent Order] between the Housing Authority and the Commission on August 20, 1975. On October 26, 1975, the Consent Order was entered into the official record of the Pennsylvania Human Relations Commission as a Final Order. The parties agreed that the Consent Order was to have the full force and effect of a Commission Order and Decree following a public hearing and that it was to be enforceable under section 10 of the Pennsylvania Human Relations Act.

The Consent Order was designed to desegregate the Housing Authority's low income housing projects as quickly as possible without disturbing the tenants already residing therein. This was to be accomplished through the use of a new tenant selection and assignment procedure. The key feature of the procedure is the creation of a target racial balance for each of the Housing Authority's family projects [1] and the use of an applicant's race as a preferential determinant in order to reach and maintain that target balance.

More specifically, the Consent Order and the Addendum thereto, which contains a

---

1. The defendants agreed that the terms of the Consent Order would not be applicable to hous-

ing projects for the elderly.

detailed implementation plan, establish the following tenant selection and assignment procedure. Beaver County, wherein all of the Housing Authority's projects are located, is divided into five geographic districts, in each of which is at least one family project. The district divisions and projects are as follows:

*District I*

1) Linmar Terrace
2) Griffith Heights
3) Linmar Terrace Extension
4) Eleanor Roosevelt Site I
5) Eleanor Roosevelt Site 2 (Elderly)
6) Sheffield Towers (Elderly)

*District II*

1) Economy Village
2) Crestview Village
3) J.F. Kennedy
4) Ambridge Towers (Elderly)

*District III*

1) Morado Dwellings
2) Harmony Dwellings
3) Pleasantview Homes
4) Mt. Washington Apts.
5) Brodhead Apts. (Elderly)

*District IV*

1) Brighton Homes
2) J. Edwards Site 1
3) J. Edwards Site 2 (Elderly)
4) Freedom Apts. Site 1
5) Freedom Apts. Site 2
6) T. Bishop Apts. (Elderly)
7) Gordan Camp Site 1
8) Gordan Camp Site 2 (Elderly)
9) Monacatootha Apts. (Elderly)
10) King Beaver Apts. (Elderly)

*District V*

1) Midcrest Homes
2) Corak Towers (Elderly)

The Consent Order establishes a target racial balance for all of the family projects, defined as the "percent of the total units owned, operated or managed by the [Housing Authority] that are occupied by Black families." Addendum to Consent Order, Exhibit "C," ¶ 1.A. Thus, racial imbalance is defined as "a situation where the percentage of Black or White families in a project is greater than the percentage of Black or White families in the total units owned, operated or managed by the Housing Authority of the County of Beaver." Consent Order, Exhibit "B," ¶ 6. The racial balance in a project is improved "whenever the Black/White ratio of any project moves closer to the Black/White ratio of the population of the entire housing authority. . . ." *Id.*

The Housing Authority is directed to "equalize the racial balance" in its projects by giving priority in all projects to tenants whose move into a particular project would improve the racial balance of the project. In order to comply with this directive, the Housing Authority is required to process applications of all persons for occupancy of any of its dwelling units in the following manner: initially, the Housing Authority must determine the racial balance in each project. If the percentage of black occupied units in a project is greater than the percentage of black occupied units in all of the Housing Authority's units, then that project has a black racial imbalance and white applicants have priority for placement in that project. Conversely, if the percentage of black occupied units in a project is less than the percentage of black occupied units in the total units owned, operated and managed by the Housing Authority, then that project has a white racial imbalance and black applicants have priority for placement in that project. The Housing Authority must maintain a list showing the racial balance for each of its projects.

When a unit becomes available, the Housing Authority must consult the project classification list to determine the racial balance of the project in which the unit is located, and also must determine the district in which the project is located. The Housing Authority then checks the applications file. Applications for housing are to be filed by district in chronological order by race and unit size requirements. "Depending upon the racial imbalance in the project, an appropriate assignment will be attempted on the basis of the applicant's race."

Addendum to Consent Order, Exhibit "C," ¶ III.B.1. The Housing Authority must offer the unit first to applicants in the racial group having priority for assignment in the project in which the vacant unit is located, in chronological order and within income and rent paying feasibility. If the applicant to whom the unit is offered refuses to accept the unit, his name is placed at the bottom of the waiting list. If a unit still remains vacant after offering the available unit to all applicants in the first priority category, then the Housing Authority must go outside of the district in which the unit is located and offer it in chronological order to all other members of the racial group that has priority, who qualify for the unit. Persons who refuse a unit outside of their district will not be placed at the bottom of the waiting list should they refuse. Finally, only after offering the unit to all qualified members of the preferred race in all districts may the Housing Authority offer the vacant unit to a member of the nonpreferred group.

The Housing Authority admitted at trial that contrary to the express provisions of the Consent Order, it failed to offer units to members of the preferred race outside of the district in which the unit was located.

A similar procedure is to be followed for tenant transfers. In other words, the Housing Authority should allow lateral transfer of tenants if it will further racial integration. In order to allow a transfer, the transfers must bring the existing racial imbalance in both projects involved closer to the projected racial balance target figure.

The Consent Order made no provision for what was to transpire once the target goal was reached in any given project. However, the Housing Authority developed the practice, implicitly approved by the Commission, of maintaining an equilibrium such that if a target balance was reached, a white family moving out was to be replaced with a white family and a black family moving out was to be replaced with a black family.

The only permissible exception to the tenant selection and assignment procedure just outlined is in the case of emergency placements. Should an applicant be in need of housing because of fire, flood, or other natural disaster or act of God, relocation due to eminent domain proceedings, legal condemnation by health or building authorities, or eviction, the Housing Authority may place that applicant in any vacant unit without regard to the effect of such placement on the racial balance of the project in which the unit is located, provided however, that no comparable units are available in any other Housing Authority project in which an emergency placement applicant would improve the racial balance. The Consent Order directs the Housing Authority to send documentation of the basis for any and all emergency placements to the Commission within ten days of the date of placement. Although the Housing Authority officials recorded the basis for each emergency placement in their own records, they failed to send the required documentation to the Commission for any of the emergency placements they made.

### C.) Plaintiffs' Claims

Plaintiffs brought this action against the Beaver County Housing Authority, James F. Tress, John F. Phillips, and their agents, successors in office, and persons acting under their direction. Plaintiffs allege in their complaint, *inter alia,* that the tenant selection, assignment and transfer procedure adopted by the Housing Authority in the Consent Order violates the United States Constitution, as well as several federal statutes and a legal duty imposed by state law. A synopsis of the four-count amended complaint follows:

1. Count I alleges a deprivation of plaintiffs' right to be free from racial discrimination in the making of contracts in violation of the Civil Rights Act of 1870, 42 U.S.C. § 1981 (1976), because of the Housing Authority's use of race as an absolute preference determinant.

2. Count II alleges a deprivation of plaintiffs' right to be free from racial dis-

crimination in the leasing of real property in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1982 (1976 & Supp. IV 1980), because of the Housing Authority's use of race as an absolute preference determinant.

3. Count III asserts a denial of due process and equal protection in violation of the Fifth and Fourteenth Amendments of the United States Constitution and section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1976 & Supp. IV 1980), because of the Housing Authority's denying or delaying access to public housing based on an applicant's race and income.

In addition, Count III asserts violations of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000d–2000d–4 (1976), Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3601–3631 (1976 & Supp. IV 1980) and various other federal housing statutes and regulations of the Department of Housing and Urban Development ("HUD").

4. Count IV asserts a pendent state claim for a violation of section 5(h) of the Pennsylvania Human Relations Act, Pa.Stat. Ann. tit. 43, §§ 951–63 (Purdon 1964).

The plaintiffs seek both declaratory and injunctive relief: a declaration that the present tenant selection and waiting list procedures violate the various aforementioned laws and an injunction restraining the defendants from using race or income as absolute selection criteria. Plaintiffs also seek a court award of attorneys' fees in accordance with 42 U.S.C. § 1988.

On July 24, 1979, the Pennsylvania Human Relations Commission filed a motion to intervene as a defendant pursuant to Fed. R.Civ.P. 24(a). The Commission sought to protect its "interest in preserving a race conscious remedy for amelioration of the segregative housing patterns found in Defendant Authority's projects." Intervenor-Defendant's Pretrial Statement at 4. On August 15, 1979, we granted the Commission's motion and added it as a defendant in the case.

During the course of the trial, several disputes surfaced concerning the meaning of certain provisions of the Consent Order. The major disagreement between the parties to that Order involves the provisions relating to the target racial balance that was established for each of the Housing Authority's family projects. The Housing Authority contends that the Consent Order establishes a fixed target racial balance of 33% in minority occupied units. The Human Relations Commission, on the other hand, maintains that the Consent Order establishes a fluctuating target racial balance; the black/white ratio of each project must be annually recalculated and the target racial balance must be adjusted accordingly in order to reflect the changes in black/white demand for housing.

That there is room for divergent interpretations of the target racial balance system becomes clear when one reads the Consent Order. On the one hand, paragraph 12 of Exhibit B provides that "[t]he Respondent shall initially and annually calculate the Black/White ratio for the total housing authority operated units and the Black/White ratio for each separate project to determine the existence of racial imbalance and the directions of such imbalance in each project." On the other hand, paragraph 1.A. of Exhibit C establishes a target racial balance of 33%. The Commission asserts that the 33% figure reflected the initial calculation, but that pursuant to Exhibit A, that figure was to be adjusted each year following the annual recalculation. The Housing Authority claims that it intended for the goal to be fixed at 33% and understood the Commission to be in accord because the Commission never indicated to the Housing Authority that its use of a 33% figure each year was incorrect, despite the fact that the Authority sent its figures to the Commission annually and despite the fact that Commission staff had conducted compliance/monitoring sessions at the Authority's office.

In *Fox v. HUD*, 680 F.2d 315 (3d Cir.1982), the Third Circuit set forth the rules that a district court must follow in dealing with a controversy over the implementation of a consent decree. "[T]he

scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *Id.* at 319, *quoting United States v. Armour & Co.,* 402 U.S. 673, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). This rule is consistent with ordinary rules of contract construction that resort to extrinsic evidence is permissible only when the instrument itself is ambiguous. Thus, a district court first must determine whether the consent decree requires extrinsic evidence in aid of its interpretation. If extrinsic evidence is admitted, the ambiguity in the consent order must be treated as a question of fact to be resolved by the fact finder, except where the evidence and resulting inferences are uncontroverted. *Fox v. HUD,* 680 F.2d at 319.

We believe that it is unnecessary for us to discern what the parties intended with respect to the target racial balance, or indeed, whether there was ever even a "meeting of the minds," because we conclude, for reasons set forth below, that the tenant selection and assignment plan that the defendants established is constitutionally and statutorily infirm regardless of whether the target racial balance is a fixed or a fluctuating percentage. Furthermore, because we strike down the plan, we need not resolve the other disagreements between the defendants concerning some of the less central provisions of the Consent Order.

Before proceeding to the merits of the case, the following chart, representing the changes in the racial composition of the Housing Authority's projects since the inception of the new tenant selection and assignment plan, provides a useful background. As the chart reflects, significant changes in racial composition have occurred in the defendant's projects, particularly, whether or not by coincidence, after the plaintiffs filed this suit in 1978.[2]

| District/Project | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 |
|---|---|---|---|---|---|---|---|
| District I | % Black Family Occupied | | | | | | |
| Linmar Terrace (F) | 31% | 31% | 34% | 33% | 33% | 32% | 32% |
| Griffith Heights (F) | 100 | 100 | 100 | 100 | 100 | 100 | 92 |
| Linmar Terrace Extension | 38 | 45 | 49 | 49 | 49 | 42 | 41 |
| E. Roosevelt Apts. (F) | 35 | 40 | 23(F& | 46 | 22(F& | 37 | 33 |
| E. Roosevelt Apts. (E) | 17 | 17 | E) | 11 | E) | 21 | –– |
| Sheffield Towers (E) | 17 | 17 | 16 | 15 | 15 | 13 | –– |
| District II | | | | | | | |
| Economy Village (F) | 7 | 7 | 8 | 8 | 10 | 24 | 29 |
| Crestview Village (F) | 12 | 12 | 10 | 15 | 16 | 28 | 33 |
| J. F. Kennedy Apts. (F) | 16 | 16 | 15 | 16 | 18 | 15 | 15 |
| Ambridge Towers (E) | 2 | 2 | 2 | 2 | 2 | 2 | –– |
| District III | | | | | | | |
| Morado Dwellings (F) | 26 | 18 | 18 | 20 | 18 | 27 | 31 |
| Harmony Dwellings (F) | 98 | 98 | 98 | 98 | 98 | 94 | 90 |
| Pleasantview Homes (F) | 11 | 15 | 20 | 22 | 23 | 32 | 27 |
| Mt. Wash. Apts. (F) | 75 | 72 | 80 | 77 | 80 | 77 | 77 |
| Brodhead Apts. (E) | 0 | 0 | 1 | 0 | 1 | 2 | –– |
| District IV | | | | | | | |
| Brighton Homes (F) | 29 | 31 | 31 | 29 | 31 | 31 | 31 |
| J. Edwards (F) | 18 | 27 | 12(F& | 31 | 12(F& | 32 | 32 |
| J. Edwards (E) | 3 | 0 | E) | 0 | E) | 0 | –– |
| Freedom Apts. (F) | 17 | 43 | 40(F& | 43 | 25(F& | 40 | 43 |

**2.** The figures followed by the letters F and E in parentheses reflect the percentage of minority occupied units in the family and elderly units combined.

| District/Project | 1975 | 1976 | 1977 | 1978 | 1979 | 1980 | 1981 |
|---|---|---|---|---|---|---|---|
| District I | % Black Family Occupied | | | | | | |
| Freedom Apts. (E) | 7 | 10 | E) | 6 | E) | 3 | --- |
| T. Bishop Apts. (E) | 3 | 2 | 3 | 3 | 3 | 3 | --- |
| Gordon Camp Site 1 (F) | 33 | 33 | 15(F& | 26 | 16(F& | 37 | 33 |
| Gordon Camp Site 2 (E) | 3 | 6 | E) | 6 | E) | 7 | --- |
| Monacatootha Apts. (E) | 0 | 0 | 0 | 0 | 0 | 0 | --- |
| King Beaver Apts. (E) | 3 | 3 | 3 | 3 | 3 | 3 | --- |
| District V | | | | | | | |
| Midcrest Homes (F) | 57 | 50 | 48 | 50 | 55 | 52 | 43 |
| Corak Towers (E) | 28 | 26 | 28 | 26 | 26 | 24 | --- |

*I.) Constitutional and Statutory Adequacy of the Defendants' Tenant Selection and Assignment Plan*

This court has the unique perspective of sitting in review on a plan that was devised seven years ago and measuring its continuing vitality under constitutional and statutory standards that have undergone considerable change and refinement during the intervening seven years.

The plaintiffs have advanced several separate legal theories which they claim establish liability against all of the defendants under the facts of this case. The heart of plaintiffs' action, however, is in their claims under the equal protection clause of the fourteenth amendment and under Title VIII of the Civil Rights Act of 1968. Although plaintiffs' claims under the various Civil Rights Statutes, 42 U.S.C. §§ 1981, 1982, and 2000d are certainly alternative and independent bases for relief, *see, e.g., Marable v. H. Walker & Associates,* 644 F.2d 390, 395 n. 16 (5th Cir.1981) (section 1982); *Wheatley Heights Neighborhood Coalition v. Jenna Resales Co.,* 447 F.Supp. 838, 844 (E.D.N.Y.1978) (section 1981), they do not add materially to plaintiffs' contentions in the circumstances of this case. *See id.* at 843–44.[3] Accordingly, we will limit our discussion hereinafter to plaintiffs' Title VIII and equal protection clause claims. We turn first to plaintiffs' constitutional challenge to the consent order.

*1. Equal Protection Claim*

Under the defendants' tenant selection and assignment plan, as discussed earlier, an applicant's race is the key factor in his selection and placement. When a project is racially imbalanced, as that term is defined in the consent order, an applicant will be placed into a vacant unit only if his placement will improve the racial balance in that project. Once the target balance is reached in a particular project, an applicant will be placed into a vacant unit there only if his race is the same as that of the vacating tenant. Thus, the defendants' plan plainly entails explicit use of racial classifications.

■ It is now well-settled that the United States Constitution is not colorblind in the absolute sense that all racial classifica-

---

**3.** For example, 42 U.S.C. § 1982, guaranteeing equal property rights to all citizens regardless of race, has been applied to cases involving racial discrimination in the sale or rental of housing. *See, e.g., Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969); *Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968). Most courts recognize that Title VIII is an alternative to § 1982 as a means of achieving equal housing opportunity.

Of course, the elements of proof differ depending on the legal theory advanced. *Compare General Building Contractors Ass'n v. Pa.,* —— U.S. ——, 102 S.Ct. 3141, 73 L.Ed.2d 835 (U.S.1982) (section 1981 requires proof of intent) *with Schmidt v. Boston Housing Auth.,* 505 F.Supp. 988 (D.Mass.1981) (proof of discriminatory intent not necessary to establish Title VIII violation).

tions are per se invalid. *See United Jewish Organizations v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977); *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978); *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980). Nevertheless, the introduction of numerical formulas allocating limited public housing facilities on the basis of race necessarily raises substantial and troubling constitutional concerns. This case requires us to decide whether the use of racial criteria, in the context presented, is a constitutionally permissible means for achieving a legitimate objective and does not violate the equal protection clause of the fourteenth amendment. "In the history of [the Supreme] Court and this country, few questions have been more divisive than those arising from governmental action taken on the basis of race." *Id.* at 516, 100 S.Ct. at 2794 (Powell, J., concurring).

■ We begin our equal protection analysis by noting that the defendants do not dispute that decisions based on race by state housing authorities and state administrative agencies are reviewable under the fourteenth amendment. *See Avery v. Midland County,* 390 U.S. 474, 479–80, 88 S.Ct. 1114, 1117–18, 20 L.Ed.2d 45 (1968) (equal protection clause reaches exercise of state power however manifested, whether exercised directly or through subdivisions of state). Nor do the parties disagree as to the appropriate level of judicial review to which we should subject defendants' tenant selection and assignment plan. "It is well-settled that state actions which restrict fundamental rights or which distinguish between individuals solely on the basis of race are regarded as inherently suspect and subject to strict judicial scrutiny." *Bakke,* 438 U.S. at 291, 98 S.Ct. at 2748 (opinion of Powell, J.), 357, 98 S.Ct. at 2782 (Brennan, White, Marshall, and Blackmun, JJ., concurring in judgment in part and dissenting in part) (hereinafter cited as joint separate opinion); *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973). No fundamental right is involved in this case. *See*

*Schmidt v. Boston Housing Auth.,* 505 F.Supp. 988, 996 (D.Mass.1981) ("[T]here is no federally protected right to low income public housing."); *Acevedo v. Nassau County,* 500 F.2d 1078 (2d Cir.1974). Rather, it is the government's denial of a benefit solely on the basis of race that triggers strict scrutiny analysis.

■ Defendants here do not argue, as have some defendants, that a less exacting standard of review is called for because of the allegedly "benign" nature of its plan. In any event, we regard any state action involving purposeful racial discrimination, however benign, against members of a minority group, as requiring analysis under the strict scrutiny standard. *Cf. Parent Association of Andrew Jackson High School v. Ambach,* 598 F.2d 705, 717 (2d Cir.1979) ("Whatever the appropriate standard of review for so-called benign race-conscious activity, compare [*Bakke*], 438 U.S. at 299, 98 S.Ct. at 2752 (opinion of Mr. Justice Powell) *with id.* at 356–62, 98 S.Ct. at 2781–82 (dissenting opinion of Mr. Justice Brennan, Mr. Justice White, Mr. Justice Marshall, Mr. Justice Blackmun), we believe that the most exacting form of review is called for when a plan arguably burdens or stigmatizes individual members of a minority group even if the plan benefits other members of the same group."

The disagreement among the parties stems from the divergent results they reach after applying strict scrutiny analysis to the plan at issue. Plaintiffs argue that the plan cannot survive that analysis. They maintain that the defendants' policies and practices constitute an impermissible intentional discrimination against black applicants to public housing projects because pursuant to the defendants' plan, an otherwise qualified applicant (i.e., one who is entitled to placement based on nonracial criteria such as date of application and family size) can be denied access to one of the defendant's projects solely on the basis of race, in order to maintain the defendants' racial quota percentages. These black applicants who are denied access to housing

are not offered alternative placements. Plaintiffs recognize that recent Supreme Court decisions have allowed race-conscious action by governmental and private entities, but argue that the actions challenged in those cases are distinguishable from those in the case at bar. Finally, to the extent that the defendants argue that integrated housing benefits blacks and whites alike, plaintiffs point out that the fourteenth amendment protects individual rights and, therefore, precludes discrimination against individual blacks in order to benefit either the racial group as a whole or society as a whole.

The Housing Authority, on the other hand, argues that its use of racial classifications fully comports with equal protection constitutional law. The Housing Authority maintains that it has a compelling state interest in promoting and maintaining integrated housing in its projects, and that absent a quota restricting the percentage of black families permitted to reside in each of its projects, "tipping" would occur leading to the complete resegregation of the projects. In addition, the Housing Authority argues that it lacks the requisite discriminatory intent for a finding of an equal protection violation.

The position of the Pennsylvania Human Relations Commission falls somewhere in between. The Commission contends that the race-conscious tenant selection plan was constitutional when it was adopted in 1975. Nonetheless, the Commission asserts that it "is not wedded to continued use of the race-conscious assignment procedures set up under the Consent Order" and, in fact, "recommends the abolition of all tenant assignment policies which on their face or by their application may exclude black applicants from projects. . . ." Pennsylvania Human Relations Commission Post-Trial Brief at 10, 13. In other words, the Commission now recommends the abolition of the very plan that it helped to create. Our task, therefore, is to apply the strict scrutiny test to the defendants' plan in order to determine its constitutionality.

■ Under the strict scrutiny test, "a government practice . . . which contains 'suspect classifications' . . . can be justified only if it furthers a compelling government purpose and, even then, only if no less restrictive alternative is available." *Bakke,* 438 U.S. at 357, 98 S.Ct. at 2782 (joint separate opinion). *See San Antonio Independent School District v. Rodriguez,* 411 U.S. at 16–17, 93 S.Ct. at 1287–1288; *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972). Traditionally, courts have deemed the government interest in not burdening racial minorities so important that virtually no competing government interests have been found sufficient to justify race-conscious action. Thus, before courts recently began to consider so-called "benign" race-conscious actions, application of strict scrutiny analysis to a racial classification almost always led to its invalidation. The only exceptions were the now famous Japanese imprisonment cases during World War II. *See Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944); *Hirabayashi v. United States,* 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943). These results led one constitutional scholar to characterize the strict scrutiny test as "strict in theory and fatal in fact." Gunther, *The Supreme Court, 1971 Term—Forward: in Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1, 8 (1972).

■ In an equal protection challenge, application of a level of judicial scrutiny should amount to more than an idle invocation of a slogan. We recognize that the use of racial classifications, even in the context of "benign" discrimination, calls for the most exacting form of judicial review. However, because an integration maintenance plan seeks the desirable goal of residential integration through potentially burdensome restrictions on black entry into low income housing projects, we believe that the plan should be reviewed under a standard that combines the most exacting level of scrutiny with the possibility that a compelling interest may be found. Thus, our review in the instant case will be strict and

searching, not fatal in fact, merely because of its application. *See Bakke,* 438 U.S. at 362, 98 S.Ct. at 2784 (joint separate opinion). Guided by these principles, we are ready to examine the merits of the arguments advanced by plaintiffs in support of their contention that the Housing Authority's tenant selection and assignment plan violates the fourteenth amendment to the United States Constitution, and the merits of defendants' arguments to the contrary.

We must address at the outset the Housing Authority's argument that the plaintiffs have failed to make out a claim for relief under the equal protection clause of the fourteenth amendment because the Housing Authority was acting to promote integration in its projects and therefore lacked the discriminatory intent required for a finding of an equal protection violation. We don't believe the Housing Authority correctly perceives the nature of the equal protection intent requirement. The Housing Authority is correct in its assertion that "purposeful discrimination is the 'condition that offends the Constitution,'" *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 274, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979) (citation omitted), because the "central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976). "Thus, when facially neutral [action] is subjected to equal protection attack, an inquiry into intent is necessary, to determine whether the [action] in some sense was designed to accord disparate treatment on the basis of racial considerations." *Washington v. Seattle School District No. 1,* — U.S. —, —, 102 S.Ct. 3187, 3199, 73 L.Ed.2d 896 (U.S.1982). *See also Bakke,* 438 U.S. at 289 n. 27, 98 S.Ct. at 2747 n. 27 (opinion of Powell, J.) ("This is not a situation in which the classification is on its face *racially neutral,* but has a disproportionate racial impact. In that situation, plaintiff must establish an intent to discriminate. *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 264–65, 97 S.Ct. 555, 562–63, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1972).")

In contrast to the *Arlington Heights* and *Washington v. Davis* cases, both of which involved challenges to classification facially unrelated to race, the plan at issue here involves a purposeful, acknowledged use of racial criteria. "A racial classification, *regardless of purported motivation,* is presumptively invalid and can be upheld only upon an extraordinary justification." *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. at 272, 99 S.Ct. at 2292 (emphasis added). *Cf. Bakke,* 438 U.S. at 289 n. 27, 98 S.Ct. at 2747 n. 27 (J. Powell distinguished the situations in *Arlington Heights* and *Washington v. Davis* from *Bakke* because "the University's special admissions program involve[d] a purposeful, acknowledged use of racial criteria.")

In two cases dealing with mandatory school busing, the Supreme Court recently reaffirmed that traditional strict scrutiny principles apply to situations in which the defendant employs a classification based on race. *See Crawford v. Board of Education of Los Angeles,* — U.S. —, —, 102 S.Ct. 3211, 3217, 73 L.Ed.2d 948 (U.S.1982) ("[i]f Proposition I employed a racial classification it would be unconstitutional unless necessary to further a compelling state interest."); *Washington v. Seattle School District No. 1,* — U.S. at —, 102 S.Ct. at 3199.

Given that the explicit use of racial discrimination, whether or not undertaken for benign purposes, triggers strict scrutiny analysis, we are now ready to apply that analysis to the plan before us.

In response to plaintiffs' equal protection challenge, the Housing Authority asserts that it has a compelling interest in promoting and maintaining integrated housing in its low-income housing projects. Defendant argues that its use of a tenant selection and assignment plan that includes a maximum quota limiting the percentage of black occupied units in each of its projects is necessary in order to prevent the occur-

rence of a sociological phenomenon known as "tipping." The tipping principle suggests that white families will abandon and avoid a particular neighborhood after the black percentage of the population exceeds a certain point, usually assumed to be somewhere between twenty-five and fifty percent black. *See generally* Goering, *Neighborhood Tipping and Racial Transition: A Review of Social Science Evidence,* 44 Am. Inst. of Planners J. 68 (1978); Ackerman, *Integration for Subsidized Housing and the Question of Racial Occupancy Controls,* 26 Stan.L.Rev. 245, 251–60 (1974). For all practical purposes, once the tipping dynamic runs its course, a neighborhood loses its integrated character and becomes predominantly black. A racial access quota establishes an upper limit on the percentage of blacks permitted to reside in a particular project, a limit set just short of the tipping point. The Housing Authority maintains that the use of a racial access quota will effectively prevent resegregation by keeping the number of blacks just below the point at which white exodus from and/or white refusal to reside in particular projects is expected to occur.

The Supreme Court has expressly recognized the importance to a community of promoting stable, racially integrated housing, because "substantial benefits flow to both whites and blacks from interracial association. . . ." *Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85, 94–95, 97 S.Ct. 1614, 1619–20, 52 L.Ed.2d 155 (1977). The gains from using "benign" housing discrimination in order to promote integration are tempered, however, by two types of injuries that are inflicted upon blacks. First, a quota device necessarily infringes on the interests of those black individuals denied access to a particular project solely because of their race. Second, blacks may be stigmatized by the implication of inferiority that accompanies government policies restricting minority access. Integration maintenance, with its express purpose to limit the percentage of black residents, may be explained only as a recognition of the reality of white flight, a phenomenon based on white prejudice.

Consequently, some black individuals may perceive benign quotas as statements by the white majority of the undesirability of blacks. One court has observed, however, in the context of a school desegregation case, that "[a]lthough white fears about the admission of minority students are ugly, those fears cannot be disregarded without imperiling integration across an entire system." *Parent Association of Andrew Jackson High School v. Ambach,* 598 F.2d 705, 720 (2d Cir.1979). But the two harms just outlined are especially troubling because they are inflicted upon individual members of a historically disadvantaged minority.

"It is settled beyond question that the 'rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. The rights established are personal rights.'" *Bakke,* 438 U.S. at 289, 98 S.Ct. at 2747 (opinion of Powell, J.), *quoting Shelley v. Kraemer,* 334 U.S. 1, 22, 68 S.Ct. 836, 846, 92 L.Ed. 1161 (1948). This personal rights view of the fourteenth amendment, i.e., that the fourteenth amendment guarantees the right not to be treated differently on the basis of race, is necessarily implicated whenever a racial access housing quota is used. The question raised by the Housing Authority's use of its integration maintenance plan, therefore, is whether an individual black may be made to suffer exclusion in an effort to prevent resegregation of the system. In other words, is the Housing Authority's effort to promote a more lasting integration in its public housing projects a sufficiently compelling purpose to justify excluding some minority housing applicants from units to which they would otherwise have access were it not for the defendants' race-conscious tenant selection and assignment plan? "The constitutional issue thus posed is not unfamiliar in a democratic society. The greatest good for the greatest number is a concept deeply embedded in our history." *Parent Association of Andrew Jackson High School v. Ambach,* 598 F.2d 708 at 719.

In support of its tenant selection and assignment plan, defendants point out that

several courts have held that under some circumstances blacks may be required to bear burdens in order to advance a societal interest.

In one line of cases, the affirmative action, public school cases, courts have approved of the use of student assignments based on race as a means of achieving or preserving school integration. Defendants point, for example, to the case of *Johnson v. Board of Education of Chicago,* 604 F.2d 504 (7th Cir.1979).[4] In that case, the plaintiffs challenged as unconstitutional a desegregation plan voluntarily adopted by the Board of Education of the City of Chicago. Under the challenged plan, separate quotas for the enrollment of blacks and whites were set as ceilings on the number of white children and the number of black children who could be admitted to these two schools. According to the Board of Education, the purpose of the quotas was to curb a trend of decreasing white enrollment and increasing black enrollment in those schools which might eventually result in "tipping" them into two predominantly black, segregated schools. Because the quotas for enrollment of blacks were set at a lower percentage level than that at which black students ordinarily would have applied and been admitted, the effect of the quotas was to exclude some blacks from admission to these schools. The quotas applicable to white students did not have this effect.

In response to the plaintiffs' challenge, the district court upheld the Board of Education's plan. The United States Court of Appeals for the Seventh Circuit affirmed. The circuit court noted that the record was uncontroverted that prior to the implementation of the plans, the attendance areas for the two high schools were rapidly changing in residential occupancy from white to black and there was a trend in enrollments toward segregated student bodies. The court concluded that the Board of Education could properly consider "the unpleasant realities of demographic change and the phenomenon of 'white flight'. . . ." 604 F.2d at 516. The court found that the state interest in promoting integration at the two schools and communities while at the same time affording all students residing in those attendance areas a viable opportunity to attend high school in an integrated setting to be compelling and that the use of racial quotas was necessary to achieve that state interest.

Similarly, in *Parent Association of Andrew Jackson School v. Ambach,* 598 F.2d at 705, the court approved in principle a voluntary desegregation plan that, to quiet white fears that neighborhood schools would tip, placed a 50% maximum quota on the number of black students attending any formerly white school. The importance of providing most students with the opportunity for school integration justified the use of maximum racial quotas that limited the access of some black students to racially mixed schools.

We note as an initial matter that since the time that the parties submitted their post trial briefs in connection with this case, the Supreme Court has vacated the judgment of the court of appeals and remanded the case to the district court.[5] *Johnson v. Board of Education of Chicago,* —— U.S. ——, 102 S.Ct. 2223, 72 L.Ed.2d 668 (1982). Therefore, the *Johnson* opinion, upon which defendant relies, contains no precedential value. In any event, we note that there is a key distinction between the use of racial access quotas in the context of school desegregation cases and their use here that is fatal to any analogy. In the school deseg-

---

4. See Footnote 5, *infra,* for an explanation of the subsequent history of this case.

5. Following the initial *Johnson* decision, 604 F.2d 504 (7th Cir.1979), the Supreme Court granted appellants' petition for a writ of certiorari, 448 U.S. 910, 100 S.Ct. 3055, 65 L.Ed.2d 1139, but then vacated the judgment and remanded the case for further consideration in light of a suggestion of mootness. The court of appeals remanded the case to the district court, which concluded that the challenge was not moot. The court of appeals agreed and reinstated its original judgment and opinion. *See Johnson,* 664 F.2d 1069 (7th Cir.1981). On June 7, 1982, the Supreme Court again vacated the circuit court's judgment. *See Johnson,* —— U.S. ——, 102 S.Ct. 2223, 72 L.Ed.2d 668 (1982).

regation cases, in spite of the fact that black choices are limited because of race, no black person is totally denied access to a government benefit because of race. For example, the plan at issue in *Johnson* provided bus transportation to primarily white or integrated high schools for those students who were not admitted to other high schools because of the quota system. Similarly, in *Jackson,* every black student was able to attend some school, albeit not necessarily an integrated school. In the case at bar, a person who is denied access to a particular vacant housing unit because he is black is not, at that time, offered alternative housing. As long as housing alternatives are not provided, the constitutional personal rights problem is not avoided.

The other case upon which the Housing Authority relies is *Otero v. New York City Housing Authority,* 484 F.2d 1122 (2d Cir. 1973). In that case, the Second Circuit found that the value of residential integration outweighed the costs of limited access and stigma resulting from government efforts to control white flight, and approved in principle a housing authority plan that imposed a maximum quota on minority occupancy of a public housing development in order to prevent tipping.

The plaintiffs, predominantly non-white persons who had been relocated from the site of a new public housing project and the surrounding urban renewal area, challenged the Housing Authority's assignment practices which denied these households first choice for the units in the public housing project erected on the site where they had formerly lived. The Housing Authority had committed most of the apartments to white renters in disregard of its own administrative regulation and its own prior representation to the plaintiffs that they would have first priority for those apartments. The plaintiffs sued the Housing Authority and HUD to prevent the rental of those units until all those displaced households had been accommodated, and to compel HUD to ensure that the Housing Authority would follow its regulations.

The *Otero* defendants alleged that the racial balance of the community was at a precarious point. They asserted that the effect of adherence to the Housing Authority's regulation would be to create a non-white "pocket ghetto" that would operate as a racial "tipping factor" causing white residents to take flight and leading eventually to the resegregation of the community. The district court held that although the Housing Authority was under a constitutional and statutory duty to foster and maintain racial integration, this duty could not as a matter of law be given effect where to do so would be to deprive a non-white minority of low cost public housing that would otherwise be assigned to him under the Authority's regulation. The Second Circuit reversed. The circuit court held that the Housing Authority's affirmative obligation to foster racial integration under Title VIII could be considered paramount in a situation where tipping was imminent even if this entailed the immediate denial of particular housing to minorities.

In discussing the Housing Authority's affirmative duty under Title VIII, the Second Circuit said that

Congress' desire in providing fair housing ... was to stem the spread of urban ghettos and to promote open, integrated housing, even though the effect in some instances might be to prevent some members of a racial minority from residing in publicly assisted housing in a particular location. The affirmative duty to consider the impact of publicly assisted housing programs on racial concentration and to act affirmatively to promote the policy of fair, integrated housing is not to be put aside whenever racial minorities are willing to accept segregated housing.

484 F.2d at 1134.

On the basis of this interpretation, the court held that the Housing Authority could limit the number of apartments to be made available to minority group members where it could show that "such action [was] essential to promote a racially balanced community and to avoid concentrated racial pock-

ets that [would] result in a segregated community." *Id.* at 1140.

The circuit court agreed with the district court that the Housing Authority had both a constitutional and a statutory duty to act affirmatively to achieve integration in housing. *Id.* at 1133. Accordingly the circuit court declared that the Housing Authority was "obligated to take affirmative steps to promote racial integration even though this may in some instances not operate to the immediate advantage of some non-white persons." *Id.* at 1125.

The Second Circuit based its decision primarily on its perception of the affirmative duties imposed on HUD, and through HUD upon local housing authorities, pursuant to Title VIII. The court provided little constitutional analysis or consideration of the constitutional implications of its decision, and therefore provides us with little constitutional guidance. First, there is no precedent for the court's conclusion that the government has a *constitutionally prescribed* affirmative action obligation to achieve integration in public housing. In the field of public education, another area in which the government provides a service which involves serious integration issues, the Supreme Court has made clear that there is no affirmative duty to integrate schools in the absence of a finding of unconstitutional segregation. *See Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 24, 91 S.Ct. 1267, 1280, 28 L.Ed.2d 554 (1971); *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 417, 97 S.Ct. 2766, 2774, 53 L.Ed.2d 851 (1977). "[E]ven where desegregation is ordered because of a constitutional violation, the Court has never held that racial balance itself is a constitutional requirement. And even where there have been segregated schools, once desegregation has been accomplished no further constitutional duty exists upon school boards or States to maintain integration." *Washington v. Seattle School District No. 1,* —— U.S. at ——, 102 S.Ct. at 3205 (Powell, J., dissenting). *See also Pasadena City Board of Education v. Spangler,* 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976).

Second, we don't believe that the *Otero* opinion adequately addresses the constitutional personal rights issue raised by restrictions on minority access to subsidized housing. The court disposes of any personal rights question by merely asserting that the duty to integrate is not a "one-way street" and that some nonwhite persons may have to suffer disadvantages from the implementation of an integration ceiling. 484 F.2d at 1125.

The defendants finally rely on recent Supreme Court decisions addressing race-conscious actions by governmental and private entities to support their use of a race-conscious tenant selection and assignment plan that includes a racial access quota. In three decisions within the past several years, the Supreme Court has focused on constitutional and statutory claims by white persons who were denied benefits afforded minorities in the interest of redressing past discrimination. In the first of these, *Regents of the University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), a white applicant to a state medical school brought suit challenging the school's refusal to admit him despite the fact that he had academic qualifications that were superior to those of several minority students who were admitted through a special admissions program that reserved sixteen percent of the openings in each class for minorities. Justice Powell, in an opinion announcing the judgment of the Court, stated that Title VI of the Civil Rights Act of 1964 proscribed only those racial classifications that would violate the equal protection clause. *Id.* at 287, 98 S.Ct. at 2746. Applying the equal protection doctrine to the university's racial quota system, Justice Powell held it unconstitutional, emphasizing its severe infringement on personal rights. *Id.* at 320, 98 S.Ct. at 2763. Justice Powell drew a distinction between the Davis quota and the busing of children from a neighborhood school to a comparable school in another neighborhood to effectuate a desegregation decree. He found that

[Bakke's] position is wholly dissimilar to that of a pupil bused from his neighbor-

hood school to a comparable school in another neighborhood in compliance with a desegregation decree. Petitioner did not arrange for [Bakke] to attend a different medical school in order to desegregate Davis Medical School; instead, it denied him admission and may have deprived him altogether of a medical education.

438 U.S. at 300 n. 39, 98 S.Ct. at 2753 n. 39 (opinion of Powell, J.)

The Brennan-group opinion, including Justices Brennan, White, Marshall, and Blackmun, concurred in Justice Powell's judgment that Title VI's prohibitions are coextensive with the equal protection clause, but differed on the substantive interpretation of the appropriate constitutional principles to be applied. They opined that strict scrutiny analysis is appropriate only when the chosen classification burdens a minority possessing "traditional indicia of suspectness," such as a history of unequal treatment, and would apply a less exacting standard of review to benign remedial discrimination against whites, requiring only that the program be substantially related to the achievement of an important government objective. *Id.* at 356–62, 98 S.Ct. at 2781–84. Justice Stevens, joined by Justices Burger, Stewart, and Rehnquist, interpreted Title VI as prohibiting the Davis quota program, making it unnecessary to consider the constitutional issues. *Id.* at 412, 98 S.Ct. at 2810 (Stevens, J., concurring in part and dissenting in part).

One year after the *Bakke* decision, the Supreme Court once again faced the question of the legality of a quota system. In *United Steelworkers of America v. Weber,* 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979), the Supreme Court approved a voluntary affirmative action plan, jointly established by an employer and a union, which allocated at least 50% of the openings in in-plant craft training programs for black employees. Plaintiff, a white male, had instituted a Title VII action protesting his exclusion from the training program in favor of black employees with less seniority. The Supreme Court defined the issue narrowly: "The only question before us is the narrow statutory issue of whether Title VII *forbids* private employers and unions from voluntarily agreeing upon bona fide affirmative action plans that accord racial preferences in the manner and for the purpose provided in the [instant] plan." *Id.* at 200, 99 S.Ct. at 2725 (emphasis in original). A majority of the Court found that although the language of Title VII appeared to proscribe the conduct engaged in by the employer and union, it was never intended to prohibit private and voluntary affirmative action aimed at correcting traditional segregation. *Id.* at 203–209, 99 S.Ct. at 2726–2730. In reaching its decision, the Court found salient the following features of the plan: that it did not unnecessarily trammel the interests of white workers, that it did not create an absolute bar to the advancement of white workers, and that the plan was temporary and was not intended to maintain racial balance, but rather would end as soon as the percentage of black skilled craft workers approximated the percentage of blacks in the local labor force. *Id.* at 208–209, 99 S.Ct. at 2729–2730.

The third case, *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), involved a challenge to the Public Works Employment Act of 1977's directive that ten percent of federal funds appropriated for local public works be reserved for contracts with minority controlled businesses. Chief Justice Burger, joined by Justices White and Powell, held the set-aside provision constitutional. Finding that Congress had before it abundant evidence of the lack of effective participation by minorities in public contracting, the Chief Justice first concluded that the legislation's remedial objectives were within the power of Congress. He then carefully examined the means Congress chose to assist minority contractors to assure that the program was "narrowly tailored to the achievement of that goal." *Id.* at 480, 100 S.Ct. at 2775.

Justice Marshall, joined by Justices Brennan and Blackmun, also approved the measure. They applied the analysis that Justice Marshall articulated in *Bakke,* i.e., that ra-

cial classifications disadvantaging nonminority groups in order to remedy present effects of past discrimination against minorities are to be upheld if they are substantially related to the achievement of those remedial objectives. *Id.* at 519, 100 S.Ct. at 2795.

Justice Powell issued a separate concurring opinion that applied the analysis set forth in his *Bakke* opinion. He reasoned that Congress had made sufficient findings of past discrimination in the construction industry to support a compelling government interest in redressing that discrimination. With respect to the means employed to achieve that interest, Justice Powell concluded that Congress is endowed with a measure of discretion in choosing a remedy, as long as the relief chosen is "equitable and reasonably necessary to the redress of identified discrimination." *Id.* at 510, 100 S.Ct. at 2791. He found that the ten percent set-aside provision was a prompt method of offering much needed experience to minority firms, temporary in nature, closely related to the percentage of minority contractors, and relatively limited in effect on third parties. Consequently, he voted to uphold the provision.

These three Supreme Court cases do little to advance defendants' cause. There are significant distinctions between the plan at issue here and those challenged in *Bakke, Weber,* and *Fullilove.* Each of those cases involved the validity of a "floor" or "access" quota in order to increase or ensure minority enrollment or participation. In contrast, the instant case involves the use of a "ceiling" or "integration" quota, which is used to limit minority enrollment and participation. There are troubling aspects of ceiling quotas that do not arise in the context of access quotas. First, whereas the affirmative action plans in *Bakke, Weber,* and *Fullilove* achieved their goals by infringing to some extent on the interests of white persons, the integration maintenance plan at issue here infringes on the interests of substantial numbers of black individuals. Justice Brennan viewed "benign quotas" only as those that prefer individual minorities at the expense of *whites*

in order to compensate for societal discrimination. *Bakke,* 438 U.S. at 361–62, 98 S.Ct. at 2784 (joint separate opinion). Second, to the extent that any of the Justices have stated or implied that racial preferences and exclusion are permissible, they have done so only where those preferences and exclusions serve remedial purposes after a finding by a governmental body (competent to make such a finding) that prior discrimination existed. To the extent that the defendants' tenant selection and assignment plan acts as a floor to increase minority access to predominantly white housing projects, it serves a remedial purpose. However, when it operates as a ceiling quota for integration maintenance purposes, it has gone beyond its remedial purpose. In *Weber,* the Supreme Court emphasized the fact that the affirmative action plan at issue there was "a temporary measure; it [was] not intended to maintain racial balance, but simply to eliminate a manifest racial imbalance." 443 U.S. at 208, 99 S.Ct. at 2729. And, as noted earlier, the Supreme Court has made clear that at least in the school systems, racial balance is not constitutionally required and once desegregation has been accomplished, the government has no further duty to maintain integration. *Washington v. Seattle School District No. 1,* —— U.S. at ——, 102 S.Ct. at 3205. Thus, the various Supreme Court decisions approving of the use of remedial quotas to ensure minority participation are not compelling precedent for the Housing Authority's use of a ceiling quota that would have the effect of limiting minority participation.

In addition, the Supreme Court decisions upon which defendants rely, in fact, contain a good deal of dicta indicating that the Court might not be sympathetic to the use of benign ceiling quotas. For example, both the Powell and Brennan-group opinions in *Bakke* suggest that the Constitution would not permit an affirmative action program that places a burden on an individual in order to advance the societal interests of that person's ethnic or racial group. 438 U.S. at 298, 361, 98 S.Ct. at 2752, 2784.

Justice Powell, emphasizing the personal or individual nature of constitutional rights, stated that "[i]f it is the individual who is entitled to judicial protection against classifications based upon his racial or ethnic background because such distinctions impinge upon personal rights, rather than the individual only because of his membership in a particular group, then constitutional standards may be applied consistently." *Bakke,* 438 U.S. at 299, 98 S.Ct. at 2752 (opinion of Powell, J.) *See also id.* at 298, 98 S.Ct. at 2752 ("Nothing in the Constitution supports the notion that individuals may be asked to suffer otherwise impermissible burdens in order to enhance the societal standing of their ethnic groups.") Justice Brennan also was particularly interested in protecting the rights of minority group members. He was concerned with the stigma that could result from programs ostensibly designed to ameliorate the effects of past discrimination. He stated in *Bakke* that "any statute must be stricken that stigmatizes any group or that singles out those least well represented in the political process to bear the brunt of a benign program." 438 U.S. at 361, 98 S.Ct. at 2784 (joint separate opinion). *See also id.* at 375, 98 S.Ct. at 2791. ("The program does not establish a quota in the invidious sense of a ceiling on the number of minority applicants to be admitted. Nor can the program reasonably be regarded as stigmatizing the program's beneficiaries or their race as inferior.") Moreover, Justice Stevens and the three other Justices concurring in his opinion in *Bakke* focused on the existence of inviolate personal rights in finding the Davis scheme illegal under Title VI, even to the extent that it considered race as only one of several factors. This raises serious questions about benign housing quotas since some individual minority apartment seekers will be excluded from consideration for particular housing units or projects solely on the basis of their race.

Finally, in the *Fullilove* case, Justice Marshall, with whom Justices Brennan and Blackmun joined in an opinion concurring in the judgment, distinguished the ten percent set aside plan by pointing out that it

did not " 'establish a quota in the invidious sense of a ceiling' on the number of minority firms that can be awarded public works contracts." 448 U.S. at 521, 100 S.Ct. at 2796, *quoting Bakke,* 438 U.S. at 375, 98 S.Ct. at 2791.

It is clear from this brief discussion of several of the Supreme Court's recent affirmative action cases that the crosscurrents contained therein do little to settle the constitutional issue of the validity of integration maintenance quotas.

■ After a careful and thorough review of the record in this case, and in light of the constitutional principles outlined above, we conclude that we need not resolve today the difficult issue of the constitutional propriety of integration maintenance quotas. Even if we assume arguendo that a housing authority's interest in maintaining residential integration is sufficiently compelling to justify its use of racial quotas that operate to exclude minorities from certain housing opportunities, it is clear that a housing authority still must prove that the use of such a race-conscious device is both a *necessary* and a *precisely tailored* means of achieving that interest. We conclude based on the record before us, that the defendants have failed to meet their burden of proof with respect to either of these requirements. Accordingly, we find their tenant assignment and selection plan constitutionally invalid.

*a.) necessity of the racial quota*

In approving in principle the use of racial occupancy controls in the *Otero* case, the Second Circuit declared that in order to justify the use of such controls, a housing authority must present "convincing evidence" that its failure to impose the controls "would almost surely lead to eventual destruction of the racial integration that presently exists in the community." 484 F.2d at 1136. In its post-trial brief, the Housing Authority argues that it is concerned about the possibility of tipping both in the projects themselves, as well as in the communities in which the projects are locat-

ed. We believe that the defendants have failed to show that existing integration in either the projects or in the surrounding communities would be destroyed absent a restriction on the number of minorities permitted to reside in public housing.

We turn first to defendant's evidence regarding the possibility of tipping in the projects themselves. The only testimony offered by the Housing Authority to suggest that tipping is a realistic problem in its projects related to one project in District I, Linmar Terrace Extension and one project in District IV, the Freedom Apartments. Carl DeChellis, Assistant Executive Director of the Housing Authority, pointed out that between 1975 and 1981, the percentage of minority occupied units in Linmar Terrace Extension increased from 38 to 41% despite the Housing Authority's efforts to keep the percentage at 33.[6] The Freedom Apartments increased from 17 to 43% minority occupied during that period. The Housing Authority claims that in the absence of a quota, tipping in the District I projects is inevitable because of the large number of minority applicants on the District I waiting lists.

The potential tipping problem in District I, however, is directly related to the defendants' own policies and procedures. The defendants' geographical districts encompass areas that are segregated by race. Applicants for housing are placed on waiting lists for projects located in the district where they reside. Thus, a district with a large black population obviously will have a high percentage of black applicants. District I has the highest percentage of black residents in Beaver County, and correspondingly, has a high percentage of black applicants for public housing. However, the percentage of black applicants countywide is considerably lower. The total percentage of black applicants on the waiting list for

the Borough of Aliquippa in District I, where the Linmar section is located, is 78%. The total percentage of blacks on the waiting lists of the Housing Authority for all family units owned by the Authority is 46%. Thus, the defendant could overcome its self-made problem by establishing a countywide waiting list that lists applicants by date of application, family size, and other relevant criteria, and by offering units as vacancies arise throughout the county. This is the system advocated by both the plaintiffs and the Commission. The prospect of any project having a large influx of minority applicants under such a system would be minimal. In other words, the potential for tipping caused by having a large percentage of minority applicants on waiting lists for a small number of projects would be eliminated because applicants would be dispersed throughout the county rather than being concentrated in one district.

We also note parenthetically that had the Housing Authority complied with the terms of the Consent Order by offering vacant units to all minority applicants throughout the county, the potential for minority concentration also would have been reduced.

Finally, the scant evidence that the Housing Authority presented with respect to the District I projects certainly does not justify the imposition of racial quotas in its projects throughout the other four districts.

The Housing Authority also did not meet its burden of proving at trial that any existing integrated communities were in danger of tipping because of the percentage of blacks residing in projects located therein. Since the inception of the Consent Order, the percentage of minority occupied units has increased in many of the Housing Authority's projects. *See, e.g.,* Economy Village (7–29%), Crestview Village (12–33%), Joseph Edwards Apts. (18–32%). Yet the Authority offered absolutely no evidence at

---

**6.** In its post-trial brief, the Housing Authority presented further facts and figures regarding the 3 Linmar Projects in District I, which the Authority claims further reflects the difficulty it is encountering there with "white flight." We believe that a post-trial brief is an inappropriate place in which to prove one's case.

Plaintiffs had no opportunity, for example, to depose any of the individuals who moved out of the projects to ascertain whether their moves were due to the increased percentage of black residents, or to some other non-racial factor. Accordingly, we will not consider this additional material.

trial of any changes in the racial composition of the communities surrounding these projects. Indeed, the only reference to the interracial stability of surrounding communities was made in one sentence by Carl DeChellis. After pointing out that the percentage of minority occupancy in the Linmar Terrace Extension project had increased from 38–41%, Mr. DeChellis testified that "[t]he Linmar Terrace Project is located in an integrated section that is quickly turning to be an all segregated area if this practice continues." (R. at 676–77). We find this bare conclusory statement regarding the community surrounding the Linmar Terrace Project insufficient to meet the defendants' "heavy burden" of proving that resegregation in the area would almost surely result in the absence of an integration ceiling. *See Otero,* 484 F.2d at 1136.

In contrast to the evidence with respect to tipping on the record now before us, the decisions upon which defendants rely, approving of the use of racial quotas, were grounded upon substantial evidence of tipping. For example, in *Johnson v. Board of Education of Chicago,* the defendant, Board of Education, indicated that it had been its experience that where no stabilization quota plans were instituted, schools situated in rapidly changing residential neighborhoods had become racially segregated. The Board submitted statistics in support of its position. One high school which adjoined the attendance area for Morgan Park High School, one of the two high schools involved in the *Johnson* case, had experienced a decline in white student enrollment from 46.6% to 1% during the period from 1970–75. Another had declined from 30.6% to 1.0%, and a third had declined from 36.2% to 6.6%. The district court found that the Morgan Park and Gage Park attendance areas had been undergoing an accelerated change in residential occupancy from white to black and that although the two high schools were still integrated at the time the plans were instituted, their enrollments were rapidly becoming predominantly black. (During the period from 1972 to 1974, black enrollment at Gage Park had increased from 1,056 to 1,361; during the

period from 1972 to 1975, black enrollment at Morgan Park had increased from 52.3% to 62.3%). Thus, the quota plans clearly were designed and necessary to prevent incipient racial segregation at the two high schools.

### b.) precise tailoring of quota plan

Our finding that the Housing Authority has failed to meet its burden of proving that the use of racial quotas in its tenant selection and assignment plan is necessary to prevent tipping and resegregation is sufficient in and of itself to establish a violation of plaintiffs' rights under the equal protection clause of the fourteenth amendment. Nonetheless, we recognize that some courts and commentators have come to regard the tipping phenomenon as a proven sociological phenomenon. *See generally* Goering, *Neighborhood Tipping and Racial Transition: A Review of Social Science Evidence,* 44 Am.Inst. Plan J. 68 (1978); Schelling, *A Process of Residential Segregation: Neighborhood Tipping,* in *Economic Foundations of Property Law* 307 (B. Ackerman ed. 1975); *United States v. Bob Lawrence Realty, Inc.,* 474 F.2d 115, 127 (5th Cir.), *cert. denied,* 414 U.S. 826, 94 S.Ct. 131, 38 L.Ed.2d 59 (1973). Thus, although the Housing Authority failed to present either general sociological evidence of tipping, or sufficient specific evidence of tipping in its projects, we will nonetheless assume arguendo that tipping poses a realistic problem in the Housing Authority's projects, i.e., that there is a point at which the percentage of black occupants in a public housing project is sufficiently high so as to cause whites residing therein to move out of the project and other whites to refuse to accept a placement in the project. However, even assuming that the use of racial occupancy controls is necessary in order to prevent tipping from occurring in the Authority's projects, we would still find the defendants' plan constitutionally infirm because it is not precisely tailored toward achieving the Housing Authority's goal of maintaining integration in its housing projects.

■ "Benign" housing quotas are impermissible if they restrict black entry into low-income housing more than is necessary to prevent tipping and resegregation. When the percentage of black residents is kept below the tipping point, the quota imposes unnecessary costs on black entrants, serving the invidious purpose of exclusion more than the benign purpose of integration. There is no evidence at all before this court to indicate that the defendants' plan includes as many black residents as is compatible with the need to avoid resegregation. In other words, there is no evidence indicating that the defendants' plan is precisely tailored toward achieving the integration objective.

First, we note that the defendants arrived at a target racial balance of 33% by dividing the number of minority occupied units in October, 1975 (353) by the total number of family units owned, operated or managed by the Housing Authority (1,040). This calculation bears no relation to any projected tipping point and indeed, it appears to be pure coincidence that the target racial balance falls within the range of tipping points suggested by the commentators. So too a fluctuating percentage recalculated annually on the basis of the percentage of minority occupied units is not specifically tailored to any projected tipping point.

Second, many sociological studies of the tipping phenomenon involve transitional neighborhoods. *See generally* Pettigrew, *Attitudes on Race and Housing,* in *Segregation In Residential Areas* 21, 25 (A. Hawley & V. Rock eds. 1973); Goering *supra;* Schelling, *supra.* There is a limited usefulness in generalizing from tipping point experiences in a neighborhood, where whites are free to buy and sell homes as they please, to low-income housing, where demand exceeds supply and whites who are in need of housing may simply have to suppress their intolerance for blacks in order to receive much needed housing. This suggests that the tipping point is probably considerably higher in low-income housing projects than in residential neighborhoods. This conclusion is bolstered by the record which shows that whites have moved into projects where the percentage of black occupants is far in excess of 33%. *See, e.g.,* Griffith Heights (100–92%), Harmony Dwellings (98–90%). Indeed, the Housing Authority must be cognizant of this distinction between neighborhood transition and public housing project transition, as reflected in its post-trial brief:

> The Griffith project was 100% Black from the time of its construction until very recently when a few whites moved into that project. That movement reflecting [sic] more on the critical housing market generally than the sustained efforts of the Authority to attract white family move-ins into black projects.

*Id.* at 36. And indeed, the Housing Authority's own figures belie the conclusion they reach regarding the tipping point in their projects. For example, the Mt. Washington project lost only one white family from 1975–1981 despite the fact that the project was 75% black. This does not indicate the kind of panic white flight situation necessitating drastic means to counteract it, that supposedly will occur when a project is 33% black.

■ The Housing Authority must pursue its integration objective with the least interference with protected rights. *Bakke,* 438 U.S. at 357, 98 S.Ct. at 2782 (separate joint opinion). "Courts must be sensitive to the possibility that less intrusive means might serve the compelling state interest equally as well." *Fullilove,* 448 U.S. at 510, 100 S.Ct. at 2791. (Powell, J., concurring). Because the defendants have not met their burden of proving both that the prospect of tipping necessitates resort to the constitutionally onerous racial quota contained in their tenant selection and assignment plan, and that that plan is precisely tailored toward achieving their integration objective, we find that the plan violates plaintiffs' rights under the equal protection clause of the fourteenth amendment.

### 2. *Title VIII*

■ The Fair Housing Act, 42 U.S.C. §§ 3601–3631 (1976 & Supp. IV 1980), was

enacted as Title VIII of the Civil Rights Act of 1968. Section 3601 of that Act provides that "[i]t is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States." Because we have concluded in section one that the defendants' tenant selection and assignment plan violates the equal protection clause of the fourteenth amendment, a *fortiori*, we find that that plan violates Title VIII of the Civil Rights Act of 1968. In this section, however, we will consider plaintiffs' Title VIII claims as an alternative and independent basis for relief.

The operative section of Title VIII, 42 U.S.C. § 3604, bars discrimination in the sale or rental of housing, including both governmentally and privately operated units, as to both the actual sale or rental and all terms and conditions; Section 3604 is among those sections of Title VIII that are enforceable by private parties. See 42 U.S.C. § 3612; *Residents Advisory Board v. Rizzo*, 564 F.2d 126 (3d Cir.1977), *cert. denied*, 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978). In fact, in *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205, 209, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972), the United States Supreme Court noted that "complaints by private persons are the primary method of obtaining compliance with [Title VIII]."

Plaintiffs contend that the Housing Authority's use of an applicant's race as a criterion for tenant selection and assignment and the Housing Authority's use of a maximum quota on the percentage of black families permitted to reside in the Housing Authority's housing projects violates two provisions of the Fair Housing Act: section 3604(a) and section 3604(b). Those two provisions make it unlawful

(a) To ... make unavailable or deny, a dwelling to any person because of race, color, religion, sex, or national origin.

(b) To discriminate against any person in the terms, conditions, or privileges of ...

rental of a dwelling ... because of race, color, religion, sex, or national origin.

To withstand plaintiffs' Title VIII attack, the Housing Authority relies on a different provision of the Fair Housing Act, which provides that "[t]he Secretary of Housing and Urban Development shall ... administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter." 42 U.S.C. § 3608(d). The Housing Authority argues that pursuant to section 3608(d) it has an obligation to act affirmatively to promote integration in its projects, and that the action it has undertaken is necessary to comply with that obligation. The defendant relies on *Otero v. New York City Housing Authority*, 484 F.2d 1122 (2d Cir.1973), discussed above, as support for its interpretation of the dictates of Title VIII.

The language used by Congress in the various provisions upon which the parties rely has created confusion as to the nature and extent of HUD's duty under Title VIII; is HUD's duty limited to enforcing non-discrimination in housing, in which case its administration of integration maintenance quotas would not be authorized, or is HUD required to act affirmatively to promote integration in housing, in which case racial occupancy controls could be permissible in certain circumstances?

The legislative history of Title VIII does not resolve the question of the statutory validity of integration quotas.[7] In fact that history indicates that Congress probably never even considered the question of HUD administration of such quotas. There was virtually no legislative debate regarding the affirmative duties placed on the Secretary of HUD under section 3608(d)(5). *Otero*, 484 F.2d at 1133 n. 14. What the legislative history does reveal is that the primary congressional intention in passing the legislation was to break up residential concentrations of minorities and to foster integrated living patterns. *See* 114 Cong.Rec. 4322

---

7. The Fair Housing Act was the product of a truncated legislative process. Neither the House nor the Senate issued a Committee Report on the legislation. *See* 144 Cong.Rec. 2270 (1968).

(1968) (remarks of Sen. Mondale) (one result of Fair Housing Act would be that "rapid, block-by-block expansion of the ghetto will be slowed and replaced by truly integrated and balanced living patterns"). Congress also intended to promote freedom of choice in housing and to prevent humiliation resulting from racially discriminatory housing practices. *See id.* at 5643 (remarks of Sen. Mondale) (Title VIII gives blacks freedom to move where they will and "removes the opportunity to insult and discriminate against a fellow American because of his color").

The legislative history further shows that at the time that Title VIII was enacted, Congress believed that strict adherence to the antidiscrimination provisions of the act would promote the policy of antisegregation; abolition of racially discriminatory housing practices ultimately would result in residential integration. Rubinowitz & Trosman, *Affirmative Action and the American Dream: Implementing Fair Housing Policies in Federal Homeownership Programs,* 74 NW.U.L.Rev. 491, 538 n. 178 (1979) (Senator Mondale's comments indicate that integrated living patterns were the expected outcome of fair-housing provisions protecting individual choice). In other words, Congress perceived antisegregation and antidiscrimination to be complementary. Unfortunately, this is not the case where a housing project is likely to tip, absent some kind of action by a local housing authority. Imposition of a quota would promote the antisegregation (or integration) policy of Title VIII; refusal to impose a quota would promote the antidiscrimination (or freedom of choice) policy. Neither the language of, nor the legislative history behind, Title VIII resolves the question of which policy must yield when the two conflict.

As discussed earlier, the Second Circuit, in *Otero v. New York City Housing Authority,* 484 F.2d 1122 (2d Cir.1973), resolves this conflict in favor of the antisegregation policy. *See id.* at 1134, 1140. The court declared that the Housing Authority's affirmative obligation under section 808(e)(5) of the Fair Housing Act, 42 U.S.C. § 3608(d)(5), to promote residential integration outweighed its duty under that statute to prevent discrimination. *Id.* at 1133–34.

We note as an initial matter that section 3608(d)(5)'s "affirmative duty," upon which the Housing Authority relies so heavily to support its actions, is by its very terms directed only toward the Secretary of HUD. The Third Circuit has expressly refrained from deciding whether the " 'affirmative duty' imposed upon HUD by § 3608(d)(5) can be imposed inferentially upon local housing authorities as well," *Resident Advisory Board v. Rizzo,* 564 F.2d 126, 140 (3d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1457, 55 L.Ed.2d 499 (1978), and, "if so, whether that duty is judicially enforceable." *Id.* at 146. Other courts that have addressed the question have considered local housing authorities to be subject to the affirmative mandate. *See, e.g., Otero v. New York City Housing Authority,* 484 F.2d at 1133–34 (local housing authority subject to dictates of section 3608(d)(5) since it receives federal assistance under a HUD-administered program); *Banks v. Perk,* 341 F.Supp. 1175, 1182 (N.D.Ohio 1972), *aff'd in part, rev'd in part,* 473 F.2d 910 (1973) (court found in Title VIII a "clear implication" that the affirmative mandate applies to local housing authorities operating in conjunction with "Federal agencies responsible for housing programs").

The results of our examination of the record in connection with plaintiffs' equal protection clause claims enables us to leave undecided until another day the issue of whether section 3608(d)(5) of Title VIII authorizes the use of integration maintenance quotas by HUD, and through HUD, by a local housing authority. We conclude that the Housing Authority has not satisfied the burden of proof necessary to withstand a Title VIII challenge, as set forth by the Third Circuit in *Resident Advisory Board v. Rizzo,* 564 F.2d at 148–49.

The *Resident Advisory Board* court placed the following evidentiary burdens on the parties in a Title VIII action. First, plaintiff must prove a prima facie case of

race discrimination. In order to do so, plaintiff need show only that the action complained of had a racially discriminatory effect; he is not required to show that the defendant acted with racially discriminatory motivation. In deciding that proof of discriminatory effect alone will establish a prima facie Title VIII case, the Third Circuit joined the ranks of several other circuit courts. *See, e.g., Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 558 F.2d 1283, 1287–90 (7th Cir. 1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 752, 54 L.Ed.2d 772 (1978); *Smith v. Anchor Building Corp.,* 536 F.2d 231, 233 (8th Cir. 1976); *Robinson v. 12 Lofts Realty, Inc.,* 610 F.2d 1032 (2d Cir.1979).

■ Once plaintiff has established a prima facie case, the burden then shifts to defendant to establish a justification for acts resulting in discriminatory effects. The "justification must serve, in theory and practice, a legitimate, bona fide interest of the Title VIII defendant, and the defendant must show that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact." 564 F.2d at 149. If the defendant fails to rebut the prima facie case, a violation is proved. If the defendant does introduce evidence that no such alternative course of action can be adopted, the burden will once again shift to the plaintiff to demonstrate that other practices are available.

■ Applying this test to the facts of the case before us, we conclude that plaintiffs have established a violation of Title VIII. The discriminatory effect of defendants' plan could hardly be clearer. An applicant for housing can be denied access to a unit into which he would otherwise be placed, solely because of his race. We recognize that the defendants' policy can also work to the detriment of white applicants.[8] However, "[t]he fact that the conduct complained of adversely affect[s]

white as well as nonwhite people . . . is not by itself an obstacle to relief under the Fair Housing Act." *Village of Arlington Heights,* 558 F.2d at 1291. *See also United States v. City of Black Jack,* 508 F.2d 1179 (8th Cir.1974), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 694 (1975); *Kennedy Park Homes Association, Inc. v. City of Lackawanna,* 436 F.2d 108 (2d Cir.1970), *cert. denied,* 401 U.S. 1010, 91 S.Ct. 1256, 28 L.Ed.2d 546 (1971). In both *City of Black Jack* and *City of Lackawanna,* local zoning ordinances prevented the construction of low-income minority projects which would not have been limited to non-white people. Both courts nonetheless found a racially discriminatory effect.

■ In order to meet its burden, the defendant was required to offer evidence of the reasons its action was taken. We believe that the Housing Authority was concerned, whether or not with good reason, about the prospect of tipping taking place in its projects. Preserving integration is a "legitimate, bona fide interest" on the part of the Housing Authority. We also conclude however, for the reasons set forth in our discussion of plaintiffs' equal protection claims, that the defendants have not shown that "no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact." *Resident Advisory Board v. Rizzo,* 564 F.2d at 149. Accordingly, we find that defendants have failed to rebut plaintiffs' prima facie case, and that plaintiffs, therefore, have established a Title VIII violation.

## II.

### *Leila Smith v. Housing Authority of the County of Beaver*

■ Plaintiffs, Leila Smith, Gia Flannigan, Joann Powell and Arlene Goosby brought a class action pursuant to 42 U.S.C. § 1983 on behalf of "all eligible, female heads of households who have applied for

---

8. In fact, the initial class action complaint was brought on behalf of both black and white housing applicants. The plaintiffs subsequently amended their complaint to provide for a plaintiff class consisting only of minority group members in order to "simplify the issues" before the court. *See* Plaintiffs' Motion to Amend Complaint.

public housing through Defendant Housing Authority and all such individuals who will apply for such housing." Plaintiffs assert that the Housing Authority employs a "family-cohesiveness" preference factor that gives priority in tenant selection to two-parent, cohesive families, in violation of, *inter alia,* plaintiffs' equal protection rights.

The only evidence that plaintiff presented at trial in connection with the *Leila Smith* case was a deposition that was taken of Louise Barnhouse, former Tenant Selection Supervisor for the Housing Authority, in connection with the *Burney* case. Mrs. Barnhouse testified at that deposition that if all other selection criteria were equal, a vacant unit would be offered to the cohesive family rather than to the single female-headed family.

At trial, the Housing Authority vigorously contested plaintiffs' claims. The Authority maintained that it does not have, nor has it in any instance invoked, any kind of preference or priority for two-parent families, or for single male parent families. The Housing Authority pointed out that Mrs. Barnhouse's deposition was never completed so that the Housing Authority had no opportunity to effectively cross-examine her. At trial, Mrs. Barnhouse testified that the Housing Authority has no policy according preference in tenant selection to so-called cohesive families, and that her prior statements were taken out of context.

The plaintiffs did not present at trial a single instance in which the Housing Authority granted a preference to a housing applicant on the basis of family cohesiveness.

Based on the foregoing, we find that the plaintiffs failed to meet their burden of proof, and accordingly, we will enter judgment in favor of the defendant.

### III.

#### *Attorneys' Fees*

In their complaint, plaintiffs' counsel requested an award of counsel fees and the costs of litigation pursuant to 42 U.S.C. § 1988 (1976). In our Order of Court, we will direct plaintiffs' counsel to submit a schedule of hours and costs and allow counsel for the defendants to submit responsive memoranda should they so desire.